**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **STUDENT DOE NO. 1,**<br><br>     **Plaintiff,**<br><br>   **v.**<br><br>**KRISTI NOEM,** *et al.*,<br><br>     **Defendants.** | **CIVIL ACTION NO: 25-1962** |

**ORDER**

 **AND NOW**, this _____ day of _____ 2025, upon consideration of Plaintiff's Motion for a Preliminary Injunction, and Defendants' response thereto, **IT IS HEREBY ORDERED** that said Motion is **GRANTED**.

 **IT IS FURTHER ORDERED** that, for the duration of this Preliminary Injunction:

 1. Defendants shall not terminate Plaintiff's record in the Student and Exchange Visitor Information ("SEVIS").

 2. Defendants shall add a notation, visible to any SEVIS user authorized to access Plaintiff's record, that the reactivation of Plaintiff's SEVIS record is retroactive to April 10, 2025. By _____, Defendants shall file a notice of compliance with this Order.

 3. Defendants may not change or otherwise modify Plaintiff's SEVIS record.

 4. Defendants are prohibited from detaining or transferring Plaintiff out of this Court's jurisdiction, or ordering the detention or transfer of Plaintiff out of this Court's jurisdiction.

 5. Defendants are prohibited from initiating removal proceedings against or deporting Plaintiff.

 6. This Order shall remain in effect until a final order is entered in this case.

It is so **ORDERED**.

**BY THE COURT:**

_____

**CYNTHIA M. RUFE, J.**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STUDENT DOE NO. 1,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO: 25-1962** |
| **KRISTI NOEM, *et al.*,** | |
| **Defendants.** | |

**PLAINTIFF'S MOTION FOR**
**A PRELIMINARY INJUNCTION**

Plaintiff, by and through undersigned counsel, hereby moves the Court, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, for a preliminary injunction enjoining Defendants from terminating his SEVIS record, requiring that Defendants add a notation that the reactivation of Plaintiff's SEVIS record is retroactive to April 10, 2025, and enjoining Defendants from detaining or seeking to deport Plaintiff while the preliminary injunction remains in effect. As set forth in the accompanying Memorandum of Law, Plaintiff has established a likelihood of success on the merits and Plaintiff will suffer irreparable harm if the preliminary injunction is denied. Granting the preliminary injunction will not result in irreparable harm to Defendants, and is in the public interest.

WHEREFORE, Plaintiff respectfully requests that the Court grant this Motion for a Preliminary Injunction and enter an order in the form of the Proposed Order submitted with this Motion.

Respectfully Submitted,

Dated: May 15, 2025

/s/ David S. Santee
David S. Santee
Pa. Bar. No. 83832

Law Offices of David S. Santee, LLC
12 Veterans Square, Suite 1
Media, PA 19063
Email: david@santeelawoffices.com
Telephone: (215) 717-8000
Facsimile: (215) 895-3995

/s/ Kasturi Sen
Kasturi Sen
Pa. Bar. No. 209351
Goldshaw Greenblatt Pierce LLC
Two Penn Center, Suite 1230
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
Email: ksen@ggplawfirm.com
Telephone: (215) 278-6865
Facsimile: (215) 445-3629

2

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STUDENT DOE NO. 1,**<br><br>          **Plaintiff,**<br><br>     **v.**<br><br>**KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; the **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **TODD LYONS**, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,<br><br>        **Defendants.** | **CIVIL ACTION NO: 25-1962** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

Table of Authorities ...........................................................................................................ii

I.    INTRODUCTION ........................................................................................................1

II.   BACKGROUND ...........................................................................................................2

   A.  Nonimmigrant Students.........................................................................................2

   B.  Plaintiff's F-1 Student Status ...............................................................................6

III.  LEGAL ARGUMENT .................................................................................................14

   A.  This Court Should Grant a Preliminary Injunction  .........................................14

     1.  There is a Reasonable Probability that Plaintiff Will Eventually Succeed
      in the Litigation ............................................................................................15

      a.  APA Claims .........................................................................................15

      b.  Violation of Procedural Due Process...................................................17

     2.  Irreparable Harm to Plaintiff ......................................................................18

     3.  Possibility of Harm to Other Interested Persons ........................................20

     4.  Public Interest .............................................................................................20

   B.  The Defendants' Voluntary Cessation Does Not Render Plaintiff's Claims Moot...........21

IV.   RELIEF SOUGHT  ......................................................................................................24

i

## TABLE OF AUTHORITIES

### Statutes and Regulations

U.S. Cons. amend V ................................................................................................17

8 U.S.C. § 1101(a)(15)(F)........................................................................................2

8 U.S.C. § 1201(i).....................................................................................................3

8 U.S.C. § 1226(a)..................................................................................................18

8 U.S.C. § 1227(a)(1)(B)....................................................................................3, 18

8 U.S.C. § 1227(a)(1)(C)(i) ...................................................................................18

8 C.F.R. § 214.1(d)...................................................................................................6

8 C.F.R. § 214.1(e)...................................................................................................5

8 C.F.R. § 214.1(f)....................................................................................................5

8 C.F.R. § 214.1(g)...................................................................................................5

8 C.F.R. § 214.2(f).................................................................................................3, 4

8 C.F.R. § 1003.18(d)(2)(B) ..................................................................................18

### Cases

*A. O. v. Cuccinelli*, 457 F. Supp. 3d 777, 794 (N.D. Cal. 2020) ..........................18

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)...............14

*Bridges v. Wixon*, 326 U.S. 135, 147 (1945) ........................................................19

*Choeum v. I.N.S.*, 129 F.3d 29, 38 (1st Cir. 1997). ................................................17

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ................................15

*Costello v. Immigr. & Naturalization Serv.*, 376 U.S. 120, 128, (1964). ...............18

*DeJohn v. Temple Univ.*, 537 F.3d 301, 309 (3d Cir. 2008)..............................21, 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992))..........................15

*Doe v. Middlebury College,* Civil Action No. 15-CV-192, 2015 W.L. 5488109 at *3 (D. Vt. Sept. 16, 2015) ................................................................................................19

*Doe v. Pennsylvania State University,* 276 F. Supp.3d 300, 314 (M.D. Pa. 2017)................17, 19

*FBI v. Fikre*, 601 U.S. 234, 241-42 (2024)...........................................................21

*Friends of the Earth, Inc. v. Laidlaw Environ. Svcs.*, 528 U.S. 167, 170, 120 S.Ct. 693, 698 (2000)...........................................................................................................21

*Jie Fang v. Dir. United States Immigr. & Customs Enf't,* 935 F.3d 172, 175-76 (3d Cir. 2019)..................................................................................................................5, 6, 16

*Michigan v. EPA*, 576 U.S. 743, 750 (2015) ...............................................................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866 (1983).........................................................................15

*People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 231 (3d Cir. 2008)..............21

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). ....................................14

*Tirrell v. Edelblut*, No. 24-CV-251-LM-TSM, 2024 WL 3898544, at *6 (D.N.H. Aug. 22, 2024)...............................................................................................................20

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ..............................20

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ......................................18

*Zadvydas v. Davis*, 533 U.S. 678, 679, 121 S. Ct. 2491, 2493, 150 L. Ed. 2d 653 (2001). ..........17

## I.    INTRODUCTION

In late March 2025, Defendants set into motion a plan to force more than 6,400 international students to leave the United States. The Defendants called it the "Student Criminal Alien Initiative." Defendants claim that the students they targeted had records in the National Crime Information Center ("NCIC") system. The group of students identified by Defendants included students who had been arrested but not convicted of any crime. An arrest, without a conviction, is not a ground for deportation or for termination of nonimmigrant status.

Defendants sent their list of students to the U.S. Department of State, which revoked any valid visas held by any of the students. Defendants then terminated each student's account in the Student and Exchange Visitor Information System ("SEVIS"). Termination of a student's SEVIS record terminates the students' nonimmigrant student status in the United States. If the termination is left to stand, the students would have no choice but to leave the United States.

Plaintiff is one of the more than 6,400 students targeted by Defendants in their Student Criminal Alien Initiative. He brought this action to challenge the termination of his SEVIS record, because Defendants had no authority under the law to do so, and because Defendants' action was arbitrary and capricious and carried out without affording him the due process that the law requires. He seeks declaratory and injunction relief under the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment.

## II.    BACKGROUND

### A. Nonimmigrant Students

The Immigration and Nationality Act ("INA") authorizes consular officers to issue visas to applicants who qualify in one of the several categories defined in 8 U.S.C. § 1101(a)(15). Subsection (a)(15)(F) addresses foreign national students

> …having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study… at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn…[1]

Students enter the United States on an "F-1" visa and are permitted to remain in "F-1 status" until the completion of their program as long as they meet the requirements established by the regulations governing the student's visa classification in 8 C.F.R. § 214.2(f).

The revocation of a visa does not constitute failure to maintain status and is not a basis for SEVIS termination.[2] ICE's own guidance confirms that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record."[3] Rather, if the visa is revoked, the student is permitted to pursue their course of study in school, but upon departure, the SEVIS record is terminated and the student must obtain a new visa from a consulate or embassy abroad before

---

[1] 8 U.S.C. § 1101(a)(15)(F).

[2] *See* Ex. A, ICE Policy Guidance 1004-04 – Visa Revocations, at 3. This was the SEVIS policy in effect when Defendants terminated Plaintiff's SEVIS record. In a Declaration dated May 6, 2025, a representative of Defendants, Assistant Director Andre Watson, refers to "a new SEVIS policy." *See* Ex. B. No such policy has been produced in this action. In a similar action, *Doe #2 v. Trump, et al.*, Civ A. No. 4:25-00175 (JGZ), D.Ariz., Defendants filed as an exhibit an April 26, 2025 memorandum issued to all SEVP personnel, styled as a "Broadcast Message," and titled, "SEVIS Notice – Policy Regarding Termination of Records. *See* Ex. C. If this is the "new SEVIS policy" to which Assistant Director Watson refers, it appears that Defendants have changed their policy to justify their actions. As demonstrated in this Motion, Defendants lack the statutory or regulatory authority to terminate a student's SEVIS record based on the revocation of the student's visa. They cannot confer such power upon themselves through a memorandum.

[3] *Id.*

returning to the United States. Although a visa revocation can be charged as a ground for deportation in removal proceedings,[4] the revocation is subject to judicial review by the immigration judge if the revocation is the sole ground for removal.[5] The immigration judge may dismiss removal proceedings where a visa is revoked, so long as a student is able to remain in valid status.[6]

Because different degrees take different times to complete, F-1 students are admitted for the "duration of status," rather than a set period of time.[7] The relevant regulation defines "duration of status" for F-1 students as follows:

> **(i) General.** Duration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students, or engaging in authorized practical training following completion of studies, except that an F-1 student who is admitted to attend a public high school is restricted to an aggregate of 12 months of study at any public high school(s). An F-1 student may be admitted for a period up to 30 days before the indicated report date or program start date listed on the Form I-20 or successor form. The student is considered to be maintaining status if the student is making normal progress toward completing a course of study.[8]

DHS's Student and Exchange Visitor Program (SEVP) administers the F-1 student program and tracks information on students in F-1 status. SEVP maintains the SEVIS database to track international students' compliance with their F-1 status. The school is required to record

---

[4] 8 U.S.C. § 1227(a)(1)(B).

[5] 8 U.S.C. § 1201(i).

[6] Failure to maintain nonimmigrant status is a ground for removal under 8 U.S.C. § 1227(a)(1)(C)(i) ("Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status . . . is deportable."). When a student is charged under this subsection in addition to 8 U.S.C. § 1227(a)(1)(B), the visa revocation would no longer be subject to judicial review in immigration court under 8 U.S.C. § 1201(i).

[7] 8 C.F.R. § 214.2(f)(5)(i).

[8] *Id.*

information in SEVIS about the student's compliance or noncompliance with the F-1 requirements.[9]

An F-1 student's course of study may include practical training when authorized by the SEVP-certified school where the student is enrolled on a full-time basis.[10] The Code of Federal Regulations authorizes two types of practical training. "Curricular Practical Training" ("CPT") is an "alternative work/study, internship, cooperative education or any other type of required internship or practicum that is offered by sponsoring employers through cooperative agreements with the school."[11] A student seeking to engage in CPT is required to request authorization from the Designated School Official ("DSO") and "may begin curricular practical training only after receiving their Form I-20 or successor form with the DSO endorsement."[12] The regulations provide very specific requirements that the DSO must fulfill to authorize a student to engage in CPT:

> To grant authorization for a student to engage in curricular practical training, a DSO will update the student's record in SEVIS as being authorized for curricular practical training that is directly related to the student's major area of study. The DSO will indicate whether the training is full-time or part-time, the employer and location, and the employment start and end date. The DSO must sign, date, and return the Form I-20 or successor form to the student prior to the student's commencement of employment indicating that curricular practical training has been approved.[13]

Similarly, the DSO may recommend a student for "Optional Practical Training," which is temporary employment that is "directly related to the student's major area of study."[14] Before

---

[9] *See* 8 C.F.R. § 214.2(f).

[10] 8 C.F.R. §214.2(f)(10).

[11] *Id.* § 214.2(f)(10)(i).

[12] *Id.*

[13] *Id.*

[14] *Id.* § 214.2(f)(10)(ii).

beginning OPT, the DSO must issue a new Form I-20 that includes a recommendation that the student be approved for OPT, and the student must apply for and be granted employment authorization by U.S. Citizenship and Immigration Services ("USCIS").[15]

A student may lose F-1 status in one of two ways: (1) the student who fails to maintain status, and (2) an agency-initiated termination of status.[16] The first category, failure to maintain status, involves circumstances where a student voluntarily or inadvertently falls out of compliance with the F-1 visa requirements, for example by failing to maintain a full course of study.[17] In addition, the regulations provide three specific circumstances under which certain conduct by a nonimmigrant visa holder "constitutes a failure to maintain status": engaging in unauthorized employment,[18] providing false information to DHS,[19] and being convicted of a crime of violence with a potential sentence of more than a year.[20] The crime of violence ground provides in full:

> **Criminal activity.** A condition of a nonimmigrant's admission and continued stay in the United States is obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed. A nonimmigrant's **conviction** in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status under section 241(a)(1)(C)(i) of the Act.[21]

---

[15] *Id.* §§ 214.2(f)(11)(i), 214.2(f)(11)(i)(A).

[16] *See, e.g., Jie Fang v. Dir. United States Immigr. & Customs Enf't,* 935 F.3d 172, 175-76 (3d Cir. 2019).

[17] 8 C.F.R. § 214.2(f).

[18] 8 C.F.R. §§ 214.1(e).

[19] 8 C.F.R. §§ 214.1(f).

[20] 8 C.F.R. §§ 214.1(g).

[21] 8 C.F.R. § 214.1(g) (emphasis supplied).

There is no regulation that provides that a nonimmigrant violates status upon revocation of his or her visa or upon being arrested.

In addition, the Code of Federal Regulations authorizes DHS to terminate a student's F-1 status in three narrow circumstances:

> **Termination of status.** Within the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated by the revocation of a waiver authorized on his or his behalf under section 212(d) (3) or (4) of the Act; by the introduction of a private bill to confer permanent resident status on such alien; or, pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.[22]

Neither DHS nor ICE has authority to terminate a student's F-1 status based on an arrest or based on the revocation of the student's visa.

### B. Plaintiff's F-1 Student Status

Plaintiff is a licensed engineer[23] who has come to the United States to earn a graduate business degree to further his career. He earned a Bachelor of Urban and Regional Planning Engineering in his home country in July 2021 and acquired over two years of work experience there as a project engineer.[24] On November 23, 2022, he was issued an F-1 student visa to attend an intensive English language program at the University of Pennsylvania.[25] He returned home after completing that program in October 2023.[26] He then applied to Temple University's Fox School of Business and, in March 2024, he was accepted to the Master of Business Administration

---

[22] 8 C.F.R. § 214.1(d). *See also Fang,* 935 F.3d 172 at 176.

[23] Pl.'s Ex. 4 to TRO Hrg.

[24] Pl.'s Ex. 2, 3 to TRO Hrg.

[25] Pl.'s Ex. 8 to TRO Hrg.

[26] Pl.'s Ex. 2 to TRO Hrg. Plaintiff's departure following his completion of the English language program may be inferred from the fact that he re-entered the United States in July 2024 to attend his program at Temple. *See* Pl.'s Ex. 9 to TRO Hrg.

program at Temple's Fox School of Business and Management for the 2024 Fall term.[27] The Master of Business Administration program is a 2 year (4 semester) program.[28]

After an international student is admitted, the school enters all required information into SEVIS and SEVIS generates a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status for that student.[29] Temple University uses a system called "ISSM," which interfaces with SEVIS.[30] In order to generate an I-20 for a student, there must be a SEVIS record for that student.[31] The SEVIS record starts in "initial" status and is later set to "active" status after the student enters the U.S. and reports to the school.[32]

On May 11, 2024, Joan McGinley, Temple University's Principle Designated School Official ("PDSO") issued a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status to Plaintiff.[33] The I-20 issued by Ms. McGinley confirmed that Plaintiff was admitted for a Master's-level Business Administration and Management program, that his start date was August 12, 2024, that he was proficient in English as required for the program, and that he had sufficient funding to cover the estimated cost of attendance for the first nine months.[34] After receiving the I-20, Plaintiff completed DHS's Form I-901, Fee Remittance Form for F-1, F-3, M-1, M-3 and J-1 Non-Immigrants, and paid the $350.00 SEVIS fee.[35]

---

[27] Pl.'s Ex. 5 to TRO Hrg.

[28] TRO Hrg. at 34-35.

[29] *Id.* at 62-63.

[30] *Id.*

[31] *Id.* at 63.

[32] *Id.*

[33] Pl.'s Ex. 6 to TRO Hrg.

[34] *Id.*

[35] Pl.'s Ex. 7 to TRO Hrg.

Plaintiff was admitted to the United States in F-1 status on July 6, 2024.[36] He was admitted for "duration of status" as indicated by the notation "D/S" on his I-94 admission record.[37] He has now completed the first two semesters of his program and has earned 24 of the 48 credits required to earn his degree.[38] Plaintiff  has applied and is awaiting approval for CPT for the summer of 2025.[39] CPT is a requirement for his MBA program.[40] According to Ms. McGinley, the school approves a student's application to participate in CPT by updating the student's record in SEVIS:

> A designated school designated school official or a principal designated school official would have to review the application [for CPT], make sure that there is the academic requirement being met, and then if it does, we either usually go into our software system and upload the event, or in a hurry, we'll go into SEVIS and upload the -- and create the event.[41]

The school cannot approve CPT for a student whose SEVIS record is in terminated status.[42] When the school approves a student for CPT, the school updates the student's I-20 with a notation on the second page in a section titled, "employment authorization."[43] The student's SEVIS record must be in active status to allow the school to enter that notation.[44]

---

[36] Pl.'s Ex. 9 to TRO Hrg.

[37] *Id.*

[38] *See*  Pl.'s Decl., 5/15/2025, ¶ 5 and supporting Ex. 1, comprising a redacted copy of his current Temple University transcript, collectively attached as Ex. D. Please note that an unredacted copy of the transcript will be shared contemporaneously with defense counsel.

[39] *See generally* Ex. D, Pl.'s Decl.

[40] TRO Hrg. at 47.

[41] *Id.* at 69.

[42] *Id.*

[43] *Id.* at 71 (referring to Pl.'s Ex. 6 to TRO Hrg.).

[44] *Id.*

On April 10, 2025, Ms. McGinley discovered that Plaintiff's SEVIS record had been terminated and notified Plaintiff in an e-mail.[45] The following explanation was entered in SEVIS regarding the termination:

> Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated.[46]

Neither Plaintiff nor Temple University received any notice that Plaintiff's SEVIS record was terminated before Ms. McGinley discovered the termination on her own.[47]

Ms. McGinley explained that the PDSO has the ability, for a limited amount of time, to reset a student's terminated SEVIS record back to active status, but only when the termination was the result of an oversight by the school.[48] Otherwise, the school would have to request that SEVP reset the student's record to active.[49] Ms. McGinley did not request that SEVP reset Plaintiff's record to active status because of reports that she had received from the PDSOs and DSOs at other schools who had made similar requests and were denied.[50]

On April 13, 2025, Plaintiff received two e-mail messages from the U.S. consular post that issued his F-1 visa.[51] The first, sent at 3:48 AM, states that Plaintiff's visa was revoked by the U.S. Department of State on April 1, 2025.[52] The e-mail message also includes several questions and answers about the legal effect of the visa revocation, including the following:

---

[45] Pl.'s Ex. 12 to TRO Hrg.

[46] Pl.'s Ex. 13 to TRO Hrg.

[47] Pl.'s Ex. 12 to TRO Hrg.

[48] TRO Hrg. at 72.

[49] *Id.* at 72-73.

[50] *Id.* at 74.

[51] ECF No. 33, P-14

[52] TRO Hrg. at 74.

> Q: What does this mean for my status? Can I stay in the United States?
>
> A: If you are already in the United States, the revocation of your visa does not control the status granted to you by U.S. Customs and Border Protection ("CBP") at the time of your entry, or your ability to stay in the United States.[53]

Approximately two hours later, at 6:01 AM, Plaintiff received a second e-mail message from the consular post.[54] This email advises Plaintiff of the following:

> The Bureau of Consular Affairs Visa Office has alerted the Department of Homeland Security's Immigration and Customs Enforcement, which manages the Student Exchange Visitor Program and is responsible for removal proceedings. They may notify your designated school official about the revocation of your F-1 visa.
>
> Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.
>
> Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App at https://www.cbp.govlabout/mobile-apps-directory/cbphome.[55]

After reading these two e-mail messages, it was not clear to Plaintiff whether he was allowed to stay in the United States any longer.[56] He was concerned that he would be detained even if he followed the instructions provided in the second e-mail message to use the CBP Home

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] TRO Hrg. at 45.

App to demonstrate his intent to depart the U.S.[57]  He had heard that other students were detained after registering with CBP Home.[58]

On April 24, 2025, the same day that this Court held a hearing on Plaintiff's Motion for a Temporary Restraining Order, Defendants reactivated Plaintiff's SEVIS record while the hearing was ongoing, and without apparently informing their own counsel. Defendants have not explained why they chose to reactivate Plaintiff's SEVIS record before receiving a Temporary Restraining Order requiring that it be done. Defendants have provided the Declaration, dated May 6, 2025, of Andre Watson, Assistant Director, National Security Division, Homeland Security Investigations, stating that Plaintiff is one of "numerous" students whose SEVIS records were terminated "due to information provided by U.S. Department of State and criminal databases."[59]

In a similar lawsuit, pending in the U.S. District Court for the District of Columbia, *Patel v. Lyons*, Civ A. No. 25-1096 (ACR),  the Defendants produced Andre Watson, Assistant Director, National Security Division, Homeland Security Investigations, to testify at a hearing on the plaintiff's motion for a preliminary injunction.[60] According to Assistant Director Watson, the visa revocations and SEVIS terminations were part of the Defendants' "Student Criminal Alien Initiative."[61] The initiative was staffed by 10 to 20 federal employees and an unspecified number of contractors.[62] Assistant Director Watson's team ran the names of all F-1 students who were in the country, approximately 1.3 million in total, through the National Crime Information Center

---

[57] *Id.*

[58] *Id.*

[59] Ex. B, Decl. of Andre Watson, 5/6/25, ¶ 4.

[60] The hearing transcript is attached as Ex. E.

[61] Ex. E at 5.

[62] *Id.* at 7.

("NCIC") database.[63] There were approximately 16,000 positive results.[64] The team then reviewed each result to confirm that the subject of the NCIC record was the same person as the student whose name was run.[65] Counsel for the government described this as a "quality control effort."[66] This resulted in a final list of approximately 6,400 students with a matching NCIC record.[67] Assistant Director Watson sent the list of approximately 6,400 names to the State Department.[68] The State Department returned two lists that together included all of the approximately 6,400 names that it had received from Assistant Director Watson; one list included students who had a valid visa and the other included students who did not.[69] The State Department revoked all of the visas that were still valid.[70] After receiving the list back from the State Department, the SEVIS records of each of the approximately 6,400 students were terminated.[71]

Assistant Director Watson's Declaration asserts that "ICE has no plans under its new SEVIS policy to re-terminate the plaintiff(s) SEVIS record based solely on the NCIC record that led to its initial termination."[72] He does not specify which "new SEVIS policy" his Declaration refers to in paragraph 6. He may be referring to the April 26, 2025 memorandum issued to all SEVP personnel, styled as a "Broadcast Message," and titled, "SEVIS Notice – Policy Regarding

---

[63] *Id.* at 9.

[64] *Id.* at 11.

[65] *Id.* at 12.

[66] *Id.* at 31.

[67] *Id.* at 12.

[68] *Id.* at 13.

[69] *Id.* at 14.

[70] *Id.*

[71] *Id.* at 23.

[72] Ex. B at ¶ 6.

Termination of Records.[73] The memorandum lists several grounds for terminating a student's SEVIS record:

> DSOs and SEVP can terminate records for several normal, administrative reasons.
>
> Additionally, SEVP can terminate records for a variety of reasons, including, but not limited to the following reasons:
>
> - Exceeded Unemployment Time
> - Failure to Comply with I-515A
> - Failure to Repay the I-901 Fee Chargeback
> - Failure to Report While on OPT
> - No Show
> - School Withdrawn
> - Violation of Change of Status Requirements
> - Change of Status Approved
> - Evidence of a Failure to Comply with the Terms of Nonimmigrant Status Exists
> - U.S. Department of State Visa Revocation (Effective Immediately)

Assistant Director Watson's Declaration makes no representations about whether Defendants intend to terminate Plaintiff's SEVIS record based on the revocation of his visa. Nothing in the e-mail message notifying Plaintiff that his visa was revoked on April 1, 2025, suggests that the revocation would become effective on a later date. Therefore, Plaintiff remains vulnerable to having his SEVIS record terminated again under the April 26, 2025 SEVIS policy, even though the policy is clearly void in that it exceeds the power granted by Congress.

Plaintiff fears that, if he not permitted to complete his program and earn his master's degree, it would "destroy" his career.[74] The government of his country, his previous employer, and all of his family and friends would believe that he failed to earn his master's degree.[75] Plaintiff has

---

[73] Ex. C.

[74] TRO Hrg. Trans. at 49.

[75] *Id.*

a job waiting for him when he returns home that would depend on his completion of the master's degree program.[76]

## III.  LEGAL ARGUMENT

To obtain a preliminary injunction, Plaintiff must first demonstrate "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured... if relief is not granted...."[77] If Plaintiff meets these "gateway thresholds," then the Court should also consider "when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."[78]

### A.  This Court Should Grant a Preliminary Injunction

For the reasons detailed at length below, Plaintiff has demonstrated a reasonable probability that the Court will find that he will eventually succeed on the merits under both the APA and the Due Process Clause of the Fifth Amendment. Defendants' actions were arbitrary, capricious, and contrary to the law and failed to provide Plaintiff with notice of meaningful opportunity to be heard. Plaintiff has also demonstrated that he will be irreparably injured if the Defendants' actions are not set aside. Thus, Plaintiff has met the gateway thresholds. The remaining factors, should the Court consider them relevant, also weigh heavily in Plaintiff's favor. There is no risk of harm to the government or anyone else if the Court were to grant injunctive relief and the public has great interest in ensuring that federal agencies do not violate an individual's right to due process or exceed the power granted to them by Congress.

---

[76] *Id.* at 55.

[77] *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)).

[78] *Id. See also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("[A] movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm").

1. **There is a Reasonable Probability that Plaintiff Will Eventually Succeed in the Litigation**

    a. **APA Claims**

"The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'[79] It requires agencies to engage in 'reasoned decisionmaking" that  is "within the scope of its lawful authority."[80] The APA requires that an agency action be "set aside if the action was 'arbitrary, capricious,'" an abuse of discretion, or otherwise not in accordance with law.'"[81] In making that determination, the court must evaluate "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[82] To survive judicial review under the APA, an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[83] Judicial review of agency action, "is limited to 'the grounds that the agency invoked when it took the action.'"[84]

Here, there is ample reasonable probability that Plaintiff will prevail on his claims under the APA because there can be no serious dispute that Defendants had no legal authority to terminate

---

[79] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

[80] *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

[81] *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) (quoting 5 U.S.C. § 706(2), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977).

[82] *Id.* at 416.

[83] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866 (1983).

[84] *Regents of the Univ. of California*, 140 S. Ct. at 1896.

Plaintiff's SEVIS record based on an arrest or based on the revocation of his student visa. Nevertheless, Defendants did just that.

Prior to the termination of Plaintiff's SEVIS record, Temple University had not reported any failure on Plaintiff's part to comply with his F-1 status. To the contrary, Plaintiff had been excelling in his academic program. He did not violate his nonimmigrant status by engaging in unauthorized employment,[85] providing false information to DHS,[86] or being convicted of a crime of violence with a potential sentence of more than a year.[87] Nor did DHS have grounds to terminate Plaintiff's status under 8 C.F.R. §214.1(d), which provides three narrow grounds for termination of status absent a violation of status: (1) a previously granted waiver under INA § 212(d)(3) or (4) [ 8 U.S.C. § 1182(d)(3) or (4)] is revoked; (2) a private bill to confer lawful permanent residence is introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination. Accordingly, Defendants' action was *ultra vires*. [88]

As Andre Watson's testimony in *Patel v. Lyons*, Civ A. No. 25-1096 (ACR), D.D.C., demonstrates, Defendants failed to engage in any consideration of any relevant factors and can supply no rational connection between the facts found and the choice made. The only factor that DHS/ICE considered is one that is impermissible under applicable law: Plaintiff's arrest. Without question, Defendants actions were arbitrary, capricious and an abuse of discretion.

---

[85] 8 C.F.R. §§ 214.1(e).

[86] 8 C.F.R. §§ 214.1(f).

[87] 8 C.F.R. §§ 214.1(g).

[88] *See Fang,* 935 F.3d at 185 n. 100 (3d Cir. 2019) (recognizing DHS's limited statutory authority to terminate F-1 status).

The termination of Plaintiff's SEVIS record is a final agency action that is reviewable under the APA.[89] An agency action is final when it represents the "'consummation' of the agency's decisionmaking process" and when it "determine[s] a 'right[] or obligation[].'"[90] The termination of F-1 status is a final agency action because a student is not required to apply for reinstatement nor wait to be placed in removal proceedings before challenging it.[91]

### b.  Violation of Procedural Due Process

The Fifth Amendment to the United States Constitution guarantees that no person may be "deprived of life, liberty, or property, without due process of law."[92]  "[T]he Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent."[93] The basic principle of a noncitizen's due process rights is "the right to notice and the nature of the charges and a meaningful opportunity to be heard."[94]

Here, it is apparent that Defendants have violated procedural due process by failing to provide Plaintiff with any notice about their decision to terminate Plaintiff's F-1 student status, an adequate explanation for their decision, or any opportunity to be heard. [95]

### 2.  Irreparable Harm to Plaintiff

---

[89] *Id.* at 182.

[90] *Id.* at 180 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, (1997)).

[91] *Id.*, at 182.

[92] U.S. CONS. amend V.

[93] *Zadvydas v. Davis*, 533 U.S. 678, 679, 121 S. Ct. 2491, 2493, 150 L. Ed. 2d 653 (2001).

[94] *Choeum v. I.N.S.*, 129 F.3d 29, 38 (1st Cir. 1997).

[95] *C.f. Doe v. Pennsylvania State University,* 276 F. Supp.3d 300, 308 (M.D. Pa. 2017) (recognizing a constitutionally protected liberty and/or property interest in educational benefits and holding that"[n]either the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary.").

17

Plaintiffs seeking a preliminary injunction must make a clear showing "that irreparable injury is likely in the absence of an injunction."[96] Losing immigration status and the benefits that go with it constitute irreparable harm.[97] Plaintiff will suffer irreparable injury if Defendants' termination determination is not set aside and enjoined.

First, if the termination of Plaintiff's SEVIS record is allowed to stand, DHS may initiate removal proceedings against Plaintiff under 8 U.S.C. § 1227(a)(1)(C)(i), which provides that one "who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted … is deportable." The U.S. Supreme Court has recognized the severity of deportation, describing it as "a drastic measure and at times the equivalent of banishment or exile. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty."[98]

Second, if placed in removal proceedings, Plaintiff may be arrested and detained pending the outcome of removal proceedings.[99] From July 6, 2024 through April 10, 2025, Plaintiff was a lawful non-immigrant in the United States and had never violated his student status. On April 10, 2025, Defendants, through unlawful and arbitrary means, thrust Plaintiff into unlawful status in

---

[96] *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[97] *See A. O. v. Cuccinelli*, 457 F. Supp. 3d 777, 794 (N.D. Cal. 2020).

[98] *Costello v. Immigr. & Naturalization Serv.*, 376 U.S. 120, 128, (1964).The fact that Plaintiff's visa has been revoked, which is also a ground for removal under 8 USC § 1227(a)(1)(B), does not nullify the irreparable harm to Plaintiff from the termination of his SEVIS record. Deportability under 8 USC § 1227(a)(1)(B) may be contested in removal proceedings. *See* 8 U.S.C. § 1201(i) (allowing immigration court review of visa revocation). The immigration judge has the authority to dismiss removal proceedings where a visa is revoked, so long as a student is able to remain in valid status. *See* 8 C.F.R. § 1003.18(d)(ii)(B). Therefore, if the unlawful revocation of Plaintiff's SEVIS record is allowed to stand without retroactive adjustment, and if Defendants are not enjoined from terminating Plaintiff's F-1 status based on Plaintiff's visa revocation, Plaintiff would not have adequate defense to removal under 8 USC § 1227(a)(1)(B).

[99] 8 U.S.C. § 1226(a)

the United States, opening him up to the severe harm of unlawful arrest, unlawful detention, and unlawful deportation.

Third, the termination of Plaintiff's SEVIS record will result in the loss of Plaintiff's academic studies and career trajectory.[100] Plaintiff will lose years of hard work that he has already put toward his graduate education in business administration. Prior to starting that program, he completed an intensive English language course so that he would have the language proficiency that is a prerequisite for the MBA program at Temple's Fox School of Business and Management. Having now completed the first of two years of his MBA program, Plaintiff stands to lose years of hard work that he has invested, starting with the intensive English language program that he completed in 2023. This type of disruption to an academic career has been held to constitute immediate and irreparable harm.[101] Furthermore, Plaintiff testified that returning to his home country without his degree would damage his reputation with the government of his country, his previous employer, and his family and friends. He would also lose future income from an employer that has offered him a position contingent on his completion of the MBA program.

Fourth, the termination of Plaintiff's SEVIS record will result in financial hardship to Plaintiff. Temple University estimated that the cost of attending the first two semester of his program would be $48,282. Plaintiff would be unable to recoup that loss if he is deprived of his ability to complete his program.

Fifth, the termination will likely result in the accrual of time out-of-status and/or unlawful presence, which is a critical factor for Plaintiff's future reinstatement of F-1 student status and

---

[100] *Bridges v. Wixon*, 326 U.S. 135, 147 (1945).

[101] *See Pennsylvania State University,* 276 F. Supp.3d at 314 (citing *Doe v. Middlebury College,* Civil Action No. 15-CV-192, 2015 W.L. 5488109 at *3 (D. Vt. Sept. 16, 2015)).

future readmission to the United States in any status. *See Fang*, 935 F.3d at 176 (noting that a student should not have been out of a valid F-1 student status for more than 5 months for a reinstatement application).

### 3.  Possibility of Harm to Other Interested Persons

Defendants have no substantial interest in terminating Plaintiff's F-1 student status. Indeed, granting a preliminary injunction would merely maintain the status quo that has been in place for 3 years of Plaintiff's studies in the United States.

Defendants also have no legitimate interest in enforcing this unconstitutional and unlawful termination or in exceeding Defendants' statutory and regulatory authority by terminating Plaintiff's F-1 student status in a manner that is contrary to federal law.

### 4.  Public Interest

The public has great interest in ensuring that federal agencies do not violate an individual's right to due process or exceed the power granted to them by Congress. [102] The public also has a strong interest in allowing foreign students to pursue education so long as they comply with applicable legal requirements. There is no public interest served in failing to enjoin Defendants here, who have failed to provide any adequate explanation or rationale for their unlawful acts, failed to produce a live witness to explain their acts despite being given multiple opportunities to do so, failed to produce any administrative record until Plaintiff filed a motion to compel its production and then produced a heavily redacted, sparse and evidently incomplete version of the

---

[102] *See, e.g., Tirrell v. Edelblut*, No. 24-CV-251-LM-TSM, 2024 WL 3898544, at *6 (D.N.H. Aug. 22, 2024) ("the public interest is harmed by the enforcement of laws repugnant to the United States Constitution."); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available.").

same the day before the instant motion was due, and, in shortly, abjectly failed to meet their heavy burden to persuade this Court that they cannot be reasonably expected to start up again.

**B. The Defendants' Voluntary Cessation Does Not Render Plaintiff's Claims Moot.**

Defendants have asserted that this case is moot now that Plaintiff's SEVIS record has been returned to active status.[103] Defendants, however, have not met their "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again.[104] "To show that a case is truly moot, a defendant must prove 'no reasonable expectation' remains that it will 'return to [its] old ways.'"[105]

The hearing record is silent on why Defendants unlawfully terminated Plaintiff's SEVIS account based solely on an arrest and Defendants have not acknowledged that they exceeded their authority in doing so. Instead, they restored Plaintiff's SEVIS record to active status without offering any assurance that they will not terminate Plaintiff's SEVIS record again in the future. Defendants have provided another declaration from Assistant Director Watson, who states that, "ICE has no plans under its new SEVIS policy to re-terminate the plaintiff(s) SEVIS record based solely on the NCIC record that led to its initial termination."[106] This "new SEVIS policy" exceeds Defendants' statutory and regulatory authority to terminate a student's F-1 status. Defendants'

---

[103] ECF 26.

[104] *Friends of the Earth, Inc. v. Laidlaw Environ. Svcs.*, 528 U.S. 167, 170, 120 S.Ct. 693, 698 (2000) (quoting *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)). *See also FBI v. Fikre*, 601 U.S. 234, 241-42 (2024); *DeJohn v. Temple Univ.*, 537 F.3d 301, 309 (3d Cir. 2008); *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 231 (3d Cir. 2008) ("It is also clear that the repeal of a challenged ordinance does not necessarily moot a challenge to the constitutionality of that ordinance if the ordinance, or one with similar constitutional infirmities, might be reenacted.");

[105] *Fikre*, 601 U.S. at 241-42 (2024) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632-633 (1953)).

[106] Ex. B, Watson Decl. ¶ 6.

equivocal claim that they will not repeat an action that they had no legal authority to take in the first place is less than reassuring.

The new SEVIS policy is hardly an attempt to avoid unlawful executive action in the future. To the contrary, the new policy would unlawfully expand Defendants' statutory and regulatory authority to terminate a nonimmigrant's status. The new policy lists several grounds on which DHS may terminate a SEVIS record that are outside of DHS's limited authority to do so. For example, the new policy purports to authorize DHS to terminate a SEVIS record of a student whose visa has been revoked by the U.S. Department of State with immediate effect. A visa revocation is not a ground for terminating F-1 status that appears in 8 C.F.R. 214.2(f) or for terminating any nonimmigrant status in 8 C.F.R. 214.1. The "new SEVIS policy" is a thinly-veiled attempt to justify the prior unlawful SEVIS record terminations.[107] However, rather than adopting a new policy designed to prevent such overreaching in the future, Defendants have doubled-down on their attempt to wield more power than the statutes and regulations provide to them.

Moreover, the reactivation of Plaintiff's SEVIS record on April 24, 2025 is not sufficient to ensure that Plaintiff will not be adversely affected by the April 10, 2025 termination in the future. Plaintiff's SEVIS record still reflects that he was in terminated status from April 10, 2025 until April 24, 2025. This apparent gap in status may affect other immigration benefits that Plaintiff may pursue in the future. For example, an applicant for adjustment of status to lawful permanent resident is generally disqualified if he or she has failed to "maintain continuously a lawful status

---

[107] *DeJohn*, 537 F.3d at 309 (holding that voluntary cessation did not render student's claim moot where defendant "defended and continues to defend not only the constitutionality of its prior sexual harassment policy, but also the need for the former policy").

since entry into the United States."[108] Similarly, one must have continuously maintained lawful nonimmigrant status to be eligible to change to another nonimmigrant category.[109]

To assess Defendants' intentions, one need look no further than how they conspired with the Department of State to trick students into leaving the U.S. voluntarily. The so-called "Student Criminal Alien Initiative" originated within DHS. It was DHS that compiled a list of over 6,400 students who were not deportable and who had not violated their F-1 status. It was DHS that sent its list to the Department of State, which revoked every visa that was still valid. It was DHS that ordered SEVP to terminate each student's SEVIS record. If, as Defendants have argued, the termination of a student's SEVIS record does not terminate the student's F-1 status, why would DHS terminate the records of the more than 6,400 students they had identified as having a record in NCIC? Perhaps the answer lies in the very first communications that Plaintiff received about the revocation of his F-1 visa. The first e-mail message stated that the revocation of his visa did not affect his nonimmigrant status. The second warned him that the revocation of his visa would be reported to ICE, which "is responsible for removal proceedings," that ICE may notify his DSO, that "[r]emaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation," that he might be whisked out of the country without having a chance to gather his personal belongings or wrap up his affairs in the U.S., and that people who are "deported may be sent to countries other than their countries of origin."[110] It is no wonder that

---

[108] 8 U.S.C. § 1255(c).

[109] 8 U.S.C. § 1258(a).

[110] Pl.'s Ex. 14 to TRO Hrg.

Plaintiff was confused and scared upon receiving this e-mail message during a time when it was widely reported that Defendants were doing all of these things to other people.[111]

## IV. RELIEF SOUGHT

For the foregoing reasons, Plaintiff asks the Court to convert the Court's existing Temporary Restraining Order into a Preliminary Injunction and order the following relief:

1. Defendants shall not terminate Plaintiff's record in the Student and Exchange Visitor Information ("SEVIS").

2. Defendants shall add a notation, visible to all SEVIS users authorized to access Plaintiff's record, that the reactivation of Plaintiff's SEVIS record is retroactive to April 10, 2025.

3. Defendants may not change or otherwise modify Plaintiff's SEVIS record.

4. Defendants are prohibited from detaining or transferring Plaintiff out of this Court's jurisdiction, or ordering the detention or transfer of Plaintiff out of this Court's jurisdiction.

5. Defendants are prohibited from initiating removal proceedings against or deporting Plaintiff.


Respectfully Submitted,

Dated: May 15, 2025                         /s/ David S. Santee

David S. Santee
Pa. Bar. No. 83832
Law Offices of David S. Santee, LLC
12 Veterans Square, Suite 1
Media, PA 19063
Email: david@santeelawoffices.com

---

[111] *See, e.g.*, Ceclia Vega, "U.S. sent 238 migrants to Salvadoran mega-prison; documents indicate most have no apparent criminal records," *CBS News (online)*, 4/6/25, available at https://www.cbsnews.com/news/what-records-show-about-migrants-sent-to-salvadoran-prison-60-minutes-transcript/.

Telephone: (215) 717-8000
Facsimile: (215) 895-3995

/s/ Kasturi Sen
Kasturi Sen
Pa. Bar. No. 209351
Goldshaw Greenblatt Pierce LLC
Two Penn Center, Suite 1230
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
Email: ksen@ggplawfirm.com
Telephone: (215) 278-6865
Facsimile: (215) 445-3629

# EXHIBIT A

*Student and Exchange Visitor Program*

**U.S. Department of Homeland Security**
SEVP MS 5600
500 12th Street, SW
Washington, DC 20536-5600



U.S. Immigration and Customs Enforcement

June 7, 2010

**POLICY GUIDANCE FOR:**      Designated School Officials

**FROM:**      Student and Exchange Visitor Program – Policy Branch

**SUBJECT:**      Policy Guidance 1004-04 –Visa Revocations

**AUTHORITIES:**      *Immigration and Nationality Act, section 244(b)(1); 8 CFR 214.2(f)(6) and (9); 8 CFR 214.2(m)(9) and 8 CFR 214.3(g)(2)*

**Comments:**

To comment on this Policy Guidance or suggest a change, please e-mail SEVIS.source@dhs.gov with "Policy Guidance 1004-04 Comment" entered in the subject line within 60 days of the date of this guidance.

**Purpose:**

The Student and Exchange Visitor Program (SEVP) wants to ensure that designated school officials (DSOs) are aware of the visa revocation process, how to record such an action in a Student and Exchange Visitor Information System (SEVIS) record, and how to respond to law enforcement inquiries involving students whose visas have been revoked.[1]

---

[1] This guidance represents SEVP's current thinking on this topic. It is advisory in nature and informational in content. Its purpose is to provide guidance to the SEVIS user community and to all SEVP personnel involved in the adjudication and review of petitions for SEVP certification and appeals.

It reflects the position on, or interpretation of, the applicable laws or regulations DHS has published as of the date of this publication, which appears on the first page of the policy guidance. This guidance does not, in any way, replace or supersede those laws or regulations. Only the latest official release of the applicable law or regulation is authoritative.

This guidance does not create or confer any rights for or on any person and does not operate to bind SEVP or the public.

SEVP has not provided previous guidance on this issue. This policy remains in effect until specifically superseded by a subsequent SEVP policy guidance or directive, or until SEVP amends the specifically cited authorities, above, with respect to this issue.


**Background:**

Visa revocations are an important tool in maintaining the security of our borders. Since September 11, 2001, the Department of State (DoS) has revoked 1,250 visas based on information suggesting possible terrorist activities or links. DoS receives a continuous stream of information that affects the eligibility of aliens to hold visas. Subsequent to an alien receiving a visa, the DoS uses any information received that calls into question the alien's suitability as a visa holder, such as a potential threat to the security of the United States, to revoke a visa. DoS revokes the visa promptly and relies on the visa application process to resolve identity and other questions at a later time, should the visa holder wish to reapply for a visa.

The revocation process supplements the terrorist watch-listing work of the Terrorist Screening Center (TSC), which provides the vast majority of the derogatory information on specific individuals. The TSC updates the DoS's Consular Lookout and Support System (CLASS) database with the derogatory information about an alien. If it appears that DoS may have issued a visa to a watch-listed alien, TSC forwards the derogatory information to the Visa Office (VO) of the Bureau of Consular Affairs, which manages the visa-revocation process for DoS.

Once it determines a possible link between the alien and the terrorist-related information, DoS formally revokes the visa. As soon as VO receives the derogatory information from TSC or other agencies, it places a revocation lookout (VRVK code) in CLASS, which replicates in real time in the Department of Homeland Security's (DHS) Interagency Border Inspection System, making the lookout available to DHS inspectors at ports of entry into the United States.

The alien does not receive advance notice that DoS is considering revoking the visa. After DoS revokes the visa, the relevant consular post attempts to contact the alien. However, the consular posts are not in a position to determine whether the alien is in the United States or to find the alien and provide him or her with notice that the revocation has occurred.

If the holder of the revoked visa reapplies for a visa at one of the embassies or consulates abroad, a consular officer carefully screens the application and, after consultation with DoS, determines eligibility. DoS might issue a new visa if it determines that the information which led to the revocation does not pertain to the alien or that the alien is in any event eligible.

**DHS Reaction to DoS Visa Revocation:**

Immigration and Customs Enforcement's Compliance Enforcement Unit (CEU) receives notification from DoS when DoS revokes a nonimmigrant's visa on national security grounds. In turn, CEU gathers additional information to prepare the case for a field investigation, if warranted. If it finds that DoS revoked an F or M visa on national security grounds, and the student is not present in the United States, CEU refers the nonimmigrant student's information to the SEVP liaison assigned to CEU.

**DSO Actions in Response to Visa Revocation Notice:**

The SEVP/CEU liaison provides a DSO with a list of the visa revocations at the DSO's school. A visa revocation may occur after the visa is issued but before the nonimmigrant enters the United States or upon arrival at a port of entry or while the nonimmigrant is in the United States.

If a DSO receives a visa revocation notice, the DSO should take the following actions in the student's SEVIS record:

- If the nonimmigrant was entering on an initial Form I-20, "Cancel" the record upon notification.

- If the nonimmigrant student was re-entering the United States to continue a program of study, enter "Terminated" in the SEVIS record for "No Show."

Some circumstances require revocation of a nonimmigrant student's visa while the nonimmigrant is in the United States and in status. Visa revocation is not, in itself, a cause for termination of the student's SEVIS record.

It is possible that neither the student in question nor the DSO has knowledge of the visa's revocation. However, law enforcement authorities may contact the school officials to verify whether the student is maintaining status.

Contact SEVP if you have questions.

**EXHIBIT B**

## DECLARATION OF ANDRE WATSON

I, Andre Watson, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Senior Official within the National Security Division (NSD) for Homeland Security Investigations (HSI). I am a career member of the Senior Executive Service with the rank of Assistant Director. Prior to becoming the Assistant Director of NSD, I served on a detail assignment to the U.S. Department of Homeland Security in the capacity of Principal Deputy Assistant Secretary for the Countering Weapons of Mass Destruction Office. I have additionally served as the HSI Special Agent in Charge in Baltimore, M.D., Deputy Special Agent in Charge in Washington, D.C., Assistant Special Agent in Charge in Houston, T.X., and Supervisory Special Agent in Blaine, W.A. I have also previously served in Headquarters assignments such as Chief of Staff to the Deputy Director of U.S. Immigration and Customs Enforcement (ICE), Chief of Intelligence for the U.S. Department of Justice, International Organized Crime and Intelligence Operations Center, and various supervisory positions within NSD.

2.      As the Senior Official within NSD, I oversee the National Security Division as well as Student and Exchange Visitor Program (SEVP) functions in support of ICE efforts to identify, disrupt and dismantle transnational criminal enterprises and terrorist organizations that threaten the security of the United States. These efforts encompass all investigations and aspects of terrorism, special interests involving state and non-state actors, human rights violators and war criminals, as well as compliance and oversight functions for over 6,900 academic institutions, 45,000 designated school officials, and over 1.2 million foreign students studying in the United States.

3.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from DHS personnel, various records, systems, databases, other Department

of Homeland Security (DHS) employees, and information portals maintained and relied upon by DHS in the regular course of business.

4.      Beginning in March of 2025, ICE reviewed and terminated numerous SEVIS records due to information provided by U.S. Department of State and criminal databases.

5.      ICE has re-activated SEVIS records for plaintiff(s) who met the parameters above.

6.      ICE has no plans under its new SEVIS policy to re-terminate the plaintiff(s) SEVIS record based solely on the NCIC record that led to its initial termination.

7.      ICE's reactivation of the plaintiff(s) SEVIS record is being made retroactive to the date of its initial termination such that there is no gap in the plaintiff(s)' SEVIS record.

8.      For plaintiff(s) who were or are currently engaged in Optional Practical Training (OPT) where SEVP also edited the SEVIS record to change the OPT employment authorization end date, the record has been reset to the end date set forth in the alien's SEVIS record before its termination.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of May 2025.


_____
                                        Andre Watson, Assistant Director
                                        National Security Division
                                        Homeland Security Investigations
                                        U.S. Immigration and Customs Enforcement
                                        U.S. Department of Homeland Security

# EXHIBIT C

FOUO – FOR INTERNAL SEVP USE ONLY

**Broadcast Message:** SEVIS Notice – Policy Regarding Termination of Records

**To:** All SEVP Personnel

**Date:** April 26, 2025

---

**General Information**

The Student and Exchange Visitor Program (SEVP) manages and tracks nonimmigrants in the F, M, and J categories. To eliminate vulnerabilities related to the nonimmigrant visa program, Congress provided broad statutory authority under 8 U.S.C. § 1372 for the Government "to develop and conduct a program to collect" information regarding nonimmigrant students and exchange visitors and to "establish an electronic means to monitor and verify" certain related information, which is the system referred to as the Student and Exchange Visitor Information System (SEVIS). Inherent in that authority is SEVP's ability to update and maintain the information in SEVIS and, as such, to terminate SEVIS records, as needed, to carry out the purposes of the program.

A terminated record in SEVIS could indicate that the nonimmigrant no longer maintains F or M status. Designated school officials (DSOs) mostly terminate F-1/M-1 students and/or F-2/M-2 dependents who do not maintain their status. However, termination does not always result in an adverse impact on the student. DSOs and SEVP can terminate records for several normal, administrative reasons.

Additionally, SEVP can terminate records for a variety of reasons, including, but not limited to the following reasons:

- o   Exceeded Unemployment Time
- o   Failure to Comply with I-515A
- o   Failure to Repay the I-901 Fee Chargeback
- o   Failure to Report While on OPT
- o   No Show
- o   School Withdrawn
- o   Violation of Change of Status Requirements
- o   Change of Status Approved
- o   Evidence of a Failure to Comply with the Terms of Nonimmigrant Status Exists
- o   U.S. Department of State Visa Revocation (Effective Immediately)

**Failure to Comply with Terms of Nonimmigrant Status**

FOUO – FOR INTERNAL SEVP USE ONLY

When SEVP has objective evidence that a nonimmigrant visa holder is no longer complying with the terms of their nonimmigrant status for any reason, then the SEVIS record may be terminated on that basis. Information should be entered into in SEVIS that identifies the failure to comply. In its discretion, ICE may conduct further investigation or initiate removal proceedings pursuant to INA § 237(a)(1)(C)(i) based on evidence that a nonimmigrant student is not complying with the terms of their nonimmigrant status.

**Visa Revocations**

Pursuant to INA § 221(i), the U.S. Department of State (State) may at any time, in its discretion, revoke an alien's visa. State can consider derogatory information provided by ICE and other U.S. law enforcement agencies in its assessment of whether visa revocation is appropriate for an alien. When State revokes an alien's visa with immediate effect, ICE should take steps to initiate removal proceedings.

If State revokes a nonimmigrant visa effective immediately, SEVP may terminate the nonimmigrant's SEVIS record based on the visa revocation with immediate effect, as such a revocation can serve as a basis of removability under INA § 237(a)(1)(B). SEVP should not, however, terminate a nonimmigrant's SEVIS record on this basis until it has confirmed that State has revoked the visa.

For additional information about SEVIS record terminations, please contact the SEVP Response Center (SRC) via phone at 703-603-3400 or 1-800-892-4829 or via email at SEVP@ice.dhs.gov. The SRC is open Monday through Friday, 8 a.m. to 6 p.m. ET, except for federal holidays.

**Disclaimer**

This Broadcast Message is not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STUDENT DOE NO. 1,

            **Plaintiff,**

    **v.**                                **CIVIL ACTION NO: 25-1962**

KRISTI NOEM, *et al.*,

            **Defendants.**

## DECLARATION OF PLAINTIFF

I, ▮▮▮▮▮▮▮▮, Plaintiff in this action with pseudonym Student Doe No. 1 declare as follows:

1. I have completed and submitted my application for Curricular Practical Training ("CPT") through Temple University's ISSS portal to intern with a sales company called TelTalk this summer.

2. I have an outstanding summer internship offer from TelTalk.

3. It is my understanding that I will be eligible to participate in the CPT program this summer, provided that Temple University can approve my application and issue me an updated Form I-20 through the SEVIS site.

4. My participation in the CPT program is a requirement for my degree.

5. A true and accurate copy of my current Temple University academic transcript is attached hereto as Exhibit 1.

6. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and corrected. Executed this 15th day of May, 2025.


May 15, 2025 11:26 EDT)

**STUDENT DOE NO. 1**



# TEMPLE UNIVERSITY
## OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION
### 1801 N. BROAD STREET, PHILADELPHIA, PA 19122

**OFFICIAL ELECTRONIC TRANSCRIPT**

**Page: 1**

Academic Record of: ███████████████

Current Name: ███████████████

Date Issued: 08-MAY-2025
Date of Birth (MM/DD): 
Student ID: ██████████
Level: Graduate

Issued To: ██████████

Parchment DocumentID: TE6JILGI

---

Course Level: Graduate

Current Program
Master of Business Admin
    Major : Business Administration

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|--------------|------|-----|-----|---|

INSTITUTION CREDIT:

2024 Fall
  Business Administration

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS |
|------|-----|--------------|------|-----|-----|
| ACCT | 5001 | Finan. & Managerial Acct | 3.00 | A | 12.00 |
| BA | 5687 | Adv. Prof. Dev. Strategies | 0.00 | P | 0.00 |
| HRM | 5001 | Leading Organizations | 3.00 | A- | 11.01 |
| SGM | 5051 | Global Business Strategy | 3.00 | A- | 11.01 |
| STAT | 5001 | Quant Methods for Business | 3.00 | A | 12.00 |

    Ehrs: 12.00 GPA-Hrs: 12.00  QPts: 46.02 GPA: 3.84

2025 Spring
  Business Administration

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS |
|------|-----|--------------|------|-----|-----|
| BA | 5002 | Socioeconomic Context of Bus | 3.00 | A | 12.00 |
| FIN | 5001 | Fin Analysis & Strategy | 3.00 | A- | 11.01 |
| MKTG | 5001 | Marketing Mgmt/Strategy | 3.00 | A- | 11.01 |
| STAT | 5602 | Visualization: Art of Numbers | 3.00 | A | 12.00 |

    Ehrs: 12.00 GPA-Hrs: 12.00  QPts: 46.02 GPA: 3.84

2025 Fall
IN PROGRESS WORK

| SUBJ | NO. | COURSE TITLE | CRED | STATUS |
|------|-----|--------------|------|--------|
| LGLS | 5701 | Legal and Ethical Foundations | 3.00 | IN PROGRESS |
| MSOM | 5001 | Operations Management | 3.00 | IN PROGRESS |
| STAT | 5606 | Data: Care, Feeding & Cleaning | 3.00 | IN PROGRESS |

    In Progress Credits    9.00

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* TRANSCRIPT TOTALS \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  | Earned Hrs | GPA Hrs | Points | GPA |
|--|-----------|---------|--------|-----|
| TOTAL INSTITUTION | 24.00 | 24.00 | 92.04 | 3.84 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 24.00 | 24.00 | 92.04 | 3.84 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* END OF TRANSCRIPT \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In accordance with USC 428 (6) (4) (8) ( The Family Educational Rights and Privacy Act of 1974), you are hereby notified that this information is provided upon the condition that you, your agents or employees will not permit any other party access to this record without consent of the student. Alteration of this transcript may be a criminal offense.

University Registrar

# EXHIBIT E

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3  AKSHAR PATEL,                    )
                                    )
4          Plaintiff,               )
                                    )
5      vs.                          )  CASE NO. 1:25-cv-01096-ACR
                                    )
6  TODD M. LYONS, Acting            )
   Director, U.S. Immigration       )
7  and Customs Enforcement,         )
                                    )
8          Defendant.               )
   _____ )
9

      TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION
10                  OR SUMMARY JUDGMENT
      **BEFORE THE HONORABLE ANA C. REYES, DISTRICT JUDGE**
11              Tuesday - April 29, 2025
                10:05 a.m. - 11:00 a.m.
12                  Washington, DC

13  **FOR THE PLAINTIFF:**
        Banias Law, LLC
14      BY:  BRADLEY BRUCE BANIAS
        602 Rutledge Avenue
15      Charleston, South Carolina 29403

16      Reddy Neumann Brown, P.C.
        BY:  STEVEN A. BROWN
17      10333 Richmond Avenue, Suite 1050
        Houston, Texas 77042
18

19  **FOR THE DEFENDANT:**
        U.S. Department of Justice, Civil Division
20      BY:  JOHNNY HILLARY WALKER, III
        601 D Street, NW
21      Washington, DC 20004

22  _____
                      **SONJA L. REEVES**
23              **Registered Diplomate Reporter**
                **Certified Realtime Reporter**
24              **Federal Official Court Reporter**
                333 Constitution Avenue, NW
25                  Washington, DC 20001
        Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 10:05 a.m.)

2          DEPUTY CLERK:  This is Civil Action 25-1096, *Akshar*

3   *Patel versus Todd M. Lyons.*

4          Would the parties please come forward and identify

5   themselves for the record.

6          MR. BANIAS:  Good morning, Your Honor.  Brad Banias

7   and Steven Brown for the plaintiff.

8          MR. WALKER:  Good morning, Your Honor.  Johnny Walker

9   with the United States Attorney's Office for the defendant.

10  I'm joined at counsel table by Andre Watson, the assist

11  director with Homeland Security; Macklin Everly, who is an

12  associate legal advisor in the district court litigation

13  section at ICE; and Annemarie Brennan-Linnan, chief of the

14  district court litigation section at ICE.

15         THE COURT:  What a great name you have.

16         First of all, can anyone tell me why today is also an

17  important day?  It's been on my calendar for a long time.

18  Anyone?  No one?

19         Today is the day that Rick Atkinson has released his

20  second book in the trilogy on the American Revolution.  If you

21  haven't read his World War II trilogy, I highly recommend it.

22  If you're at all interested in the founding of America and the

23  constitutional system and the Revolutionary War, I highly

24  recommend the first book.

25         The second book starts off in France with the King and

1    Marie Antoinette hanging out with Ben Franklin, and the

2    precarious situation that the French were in because they hated

3    England, they just lost the seven-year war and were super upset

4    about that, so they wanted to support the U.S., but they didn't

5    really want to be seen as supporting a bunch of rebels seeking

6    republicanism against the monarchy.

7            So if you want to hear about how we got rid of the

8    monarchy in the United States, I commend to you his second

9    book.

10           With that, Mr. Walker, I have a number of questions

11   for you about the administrative record that you filed last

12   night.

13           MR. WALKER:  Certainly.

14           THE COURT:  And thank you for doing that.

15           First -- so the first thing I have is a Tuesday,

16   April 1st, 2025 email at 4:58 p.m. from an Andre Watson to a

17   Mr. Meyers.  And Mr. Watson is the assistant director for the

18   U.S. Department of Homeland Security, ICE.  And he says, "In

19   furtherance of our student criminal alien initiative, the

20   attached letterhead," et cetera.

21           What is the student criminal alien initiative?

22           MR. WALKER:  I don't know precisely what the scope of

23   that is.  I think what you see described in this record and

24   throughout the administrative record is sort of the process

25   that Mr. Watson described.

```
 1              THE COURT:  Well, there was no process, just to be
 2    clear.  There was an email saying "here are the people," and an
 3    email saying "get rid of them all."  So we'll go through that
 4    process, but I want to know, what is the student criminal alien
 5    initiative?
 6              MR. WALKER:  Like I said, I don't know the exact scope
 7    of what that is.
 8              THE COURT:  Well, where is it?  Where can I find it?
 9              MR. WALKER:  Where is the initiative?
10              THE COURT:  Yeah, where can I find it?
11              MR. WALKER:  I believe that that's just a term that is
12    being used here by Mr. Watson to refer to what was described in
13    the declaration where ICE ran a number of students through the
14    NCIC, passed the hits along to the Department of State, and
15    then the Department of State passed the information back to ICE
16    about requesting that certain of those records be terminated in
17    SEVIS, and the records were terminated in SEVIS based on the
18    criminal record.
19              THE COURT:  Okay.  You're from DHS?
20              MR. WATSON:  Yes, ma'am.
21              THE COURT:  Do you know what the student criminal
22    alien initiative is?
23              MR. WATSON:  Yes, ma'am.
24              THE COURT:  What is it?
25              MR. WATSON:  This initiative --
```

1          THE COURT:  First of all, come on up.  Are you an

2   attorney?

3          MR. WATSON:  No, ma'am.

4          THE COURT:  Great.  You survived not having to go to

5   law school, and, yet, here you are.

6          Give me your name again, sir.

7          MR. WATSON:  It's Andre Watson.

8          THE COURT:  Oh, we met last time.

9          MR. WATSON:  Yes, ma'am.

10          THE COURT:  Welcome to the DC area.

11          MR. WATSON:  Thank you.

12          THE COURT:  First of all, where can I find the student

13   criminal alien initiative?

14          MR. WATSON:  This initiative is centered at DHS

15   headquarters.

16          THE COURT:  Is it in writing anywhere?

17          MR. WATSON:  No, ma'am.

18          THE COURT:  It's just out there in the world?

19          MR. WATSON:  It's a name that was given by my staff to

20   this specific effort to scrub records from SEVIS through NCIC

21   to determine if there were positive criminality hits within

22   NCIC.

23          THE COURT:  When you say -- tell everyone what NCIC

24   is.

25          MR. WATSON:  National Crime Information Center.

```
 1              THE COURT:  It's a database of people, right?

 2              MR. WATSON:  Yes, ma'am.

 3              THE COURT:  It includes people who have been arrested

 4    but not tried, right?

 5              MR. WATSON:  Yes, ma'am.

 6              THE COURT:  It includes people who have been arrested

 7    but not convicted, right?

 8              MR. WATSON:  Yes, ma'am.

 9              THE COURT:  It includes people, I suppose, who have a

10    ticket for reckless driving, even if those charges were not

11    brought, right?

12              MR. WATSON:  Yes, ma'am.

13              THE COURT:  It includes people who are missing,

14    missing people records, right?

15              MR. WATSON:  Yes, ma'am.

16              THE COURT:  So when we say the -- what did you call it

17    again?  National -- what was it again?  National what?

18              MR. WATSON:  National Security Division.

19              THE COURT:  No, no, NCIC.

20              MR. WATSON:  National Crime Information Center.

21              THE COURT:  So when we say the National Crime

22    Information Center, we don't mean that everyone in the database

23    has committed a crime, right?

24              MR. WATSON:  Yes, ma'am.

25              THE COURT:  I'm right about that?
```

 1                MR. WATSON:  Yes, ma'am.

 2                THE COURT:  For example, it would be inappropriate to

 3      run NCIC for a bunch of names, have them pop up and terminate

 4      them based on that reason alone, right?

 5                MR. WATSON:  I'm sorry?

 6                THE COURT:  It would be inappropriate to run through

 7      the SEVIS database a number of names, have them pop up as being

 8      in the database, and then terminate them on that reason alone,

 9      right?  Because it could be that they were never charged.  It

10      could be that they were just there for speeding.  It could be

11      that they were just missing persons, right?

12                MR. WATSON:  That's fair, but it's done on a

13      case-by-case review, and that is what my staff endeavored to do

14      based on the positive hits that were identified.  And as such,

15      we categorized those positive hits based on the charge and any

16      disposition.  And from there, the appropriate responses were

17      categorized in spreadsheets that were then sent to the

18      Department of State.

19                THE COURT:  How big of a staff did you have doing

20      this?

21                MR. WATSON:  Rough order of magnitude, I would put it

22      between 10 to 20 federal employees.

23                THE COURT:  What exactly did they do?  How did they

24      start?

25                MR. WATSON:  I'm sorry, ma'am?

```
 1              THE COURT:  What exactly did these 10 to 20 people do?
 2              MR. WATSON:  These 10 to 20 people serve in various
 3      roles as analysts --
 4              THE COURT:  I don't care what they do.  I mean,
 5      apparently what they did was not important enough to pull 10 to
 6      20 federal employees to search a bunch of records for students
 7      who were in the U.S. legally.
 8              Let's put aside what they do during their day jobs and
 9      just focus for me right now on what they did with respect to
10      this effort.  You got them together and you told them to do
11      what?
12              Were you in charge of this effort, sir?  You said it
13      was your staff.
14              MR. WATSON:  My staff supported the effort, so --
15              THE COURT:  Who is in charge of the effort?  Who is
16      like the head honcho on this effort?
17              MR. WATSON:  For my program office, that is acting
18      executive associate director Robert Hammer.
19              THE COURT:  Hammer?
20              MR. WATSON:  Yes, ma'am.
21              THE COURT:  Appropriate last name given what has
22      happened, but go ahead.
23              MR. WATSON:  So at the instruction of leadership, we,
24      being ICE, took action --
25              THE COURT:  Leadership at DHS?
```

1          MR. WATSON:  Yes, ma'am.

2          THE COURT:  You, ICE, took action.

3          MR. WATSON:  To take the population of nonimmigrant

4    students studying in the United States and run them through

5    NCIC.

6          THE COURT:  So name by name, everyone had to be run

7    through this database?

8          MR. WATSON:  Yes, ma'am.

9          THE COURT:  How many people did you run through this

10   database?

11         MR. WATSON:  Just under 1.3 million.

12         THE COURT:  Are you telling me that with all of the

13   cost-cutting that we have going on right now, because

14   apparently we're spending too much money on the federal

15   government doing things like, oh, I don't know, funding cancer

16   research, can't afford to do that, that we had -- not "we,"

17   someone had 10 to 20 federal employees spend their time going

18   name by name in a database to see what hits they got for

19   1.3 million people?  Is that what happened?  Yes or no.

20         MR. WATSON:  Yes, with contract support.

21         THE COURT:  Hold on.  And once you ran -- how long did

22   that take?

23         MR. WATSON:  I would estimate between two to three

24   weeks.

25         THE COURT:  Okay.  Now, humor me.  What were these

1    other people who were taken away from their jobs for two to

2    three weeks putting names into a database to see what hits they

3    would get, what other things would they normally be doing?

4            MR. WATSON:  This is part of our lines of effort.  So

5    within my division annually, we are responsible for taking data

6    from various sources to determine if in fact we have overstays

7    or people that are out of status.

8            THE COURT:  When was the last time that the government

9    made an effort to take a number of employees to put all

10   students who are here on visas through the NCIC database?

11           How long have you been in your office?

12           MR. WATSON:  I've been in this role for over four

13   years.

14           THE COURT:  In your four years in the role, how often

15   has that happened, for the students -- to put all the students

16   in the U.S. here on visas through the database, NCIC database?

17           MR. WATSON:  We do in addition to students.

18           THE COURT:  No, no, I'm just asking about students.

19   When was the last time that there was an initiative somewhere

20   along the line of the student criminal alien initiative?

21           MR. WATSON:  For specific students, I'm not aware of

22   an effort at this magnitude.

23           THE COURT:  Now, of the 1.3 million people that 10 to

24   20 federal employees spent to two to three weeks -- I just want

25   to make sure I understand this.

1           If I'm one of the federal employees, I would have a

2    list of all the students here on F-1 visas, right?

3           MR. WATSON:  Uh-huh.

4           THE COURT:  And I would be given, I don't know, 1,000

5    of the names to handle.  And the first name would be Jane

6    Smith.  So I would go to the NCIC database and put in the name

7    Jane Smith, correct?

8           MR. WATSON:  In that instance, these were batch runs,

9    so based on the capabilities that already exist within --

10           THE COURT:  How many batch runs were run?

11           MR. WATSON:  I don't have the exact number.

12           THE COURT:  But enough for us to be spending time

13    going through 1.3 million people, right?

14           MR. WATSON:  Yes, ma'am.

15           THE COURT:  And out of those 1.3 million people that

16    10 to 20 federal employees spent to two to three weeks tracking

17    down in NCIC, how many of those came up as a hit in the NCIC

18    system?

19           MR. WATSON:  Over 16,000, and then from there, the

20    number went down to 13,900.

21           THE COURT:  And then what went down from there?  Hold

22    on one second.  16,000 out of 1.3 million people?

23           MR. WATSON:  Yes, ma'am.

24           THE COURT:  You want to tell me what percent that is?

25           MR. WATSON:  I don't know off the top of my head.

1          THE COURT:  All right.  It's less than 1 percent.

2     It's less than 100th of a percent.

3          Now, of those 16,000 people --

4          Sam, can you get me the right number since you're our

5     math person?

6          Of those 16,000 people, what happened next?

7          MR. WATSON:  Continued analysis to, one, validate the

8     match between what the NCIC record was against what the SEVIS

9     record was.

10          THE COURT:  Because you might have a John Smith, then

11     it would be a different John Smith?

12          MR. WATSON:  Yes, ma'am.

13          THE COURT:  So when we did that, how many people came

14     out of the 16,000?

15          MR. WATSON:  Just over 6,400.

16          THE COURT:  So then we're down to 10,000.

17          MR. WATSON:  Below 10,000.

18          THE COURT:  What happened next with those 10,000?

19          MR. WATSON:  Those were consolidated on spreadsheets

20     based on close of business activities, and then referred to the

21     Department of State.

22          THE COURT:  What does "close of business activities"

23     mean?

24          MR. WATSON:  How many you can do in one day.

25          THE COURT:  Oh, so batches would go to them?

```
 1              MR. WATSON:  Correct.

 2              THE COURT:  And then you sent that off to State?

 3              MR. WATSON:  Yes, ma'am.

 4              THE COURT:  And then what happened?

 5              MR. WATSON:  State conducted their own analysis.

 6              THE COURT:  Do you know what State did?

 7              MR. WATSON:  No, ma'am.

 8              THE COURT:  Okay.  Go ahead.  Do you know who you were

 9  interacting with at State?

10              MR. WATSON:  Primarily, John Armstrong.

11              THE COURT:  What's his role?

12              MR. WATSON:  But in his absence, there were delegates.

13              THE COURT:  Who is Mr. Armstrong?  What's his role at

14  the State Department?

15              MR. WATSON:  He's the senior official for the Bureau

16  of Consular Affairs.

17              THE COURT:  Consular affairs, that's diplomats?

18              MR. WATSON:  I don't know.

19              THE COURT:  You don't know.  Okay.

20          So then how many hits do you get back -- you don't

21  know how many people at the State Department were running these

22  10,000 names, right?

23              MR. WATSON:  Not exactly, no, but I know we referred

24  over 6,400 to them.

25              THE COURT:  6,400 is the number you referred to them?
```

 1            MR. WATSON:  That's correct.

 2            THE COURT:  Got it.  I made a mistake.  You referred

 3  to State 6,400 names out of the 1.3 million?

 4            MR. WATSON:  Yes, ma'am.

 5            THE COURT:  Sam, can you tell me what percentage that

 6  is when you get it?

 7            MS. BLOND:  0.5 percent.

 8            THE COURT:  So less than half of a percent?

 9            MR. WATSON:  Yes, ma'am.

10            THE COURT:  How many names did State send back to you?

11            MR. WATSON:  All of the names came back, but there

12  were some who had revocations based on a valid visa.

13            THE COURT:  Tell me what that means.  What's a

14  revocation based on a valid visa?

15            MR. WATSON:  That they are in status for the purposes

16  of the visa, but State conducted revocation.

17            THE COURT:  You mean State took the visa away?

18            MR. WATSON:  I think so.

19            THE COURT:  Okay.  And State didn't tell you why they

20  did it?

21            MR. WATSON:  I did not see the State response to say

22  why.

23            THE COURT:  It's just they gave you a bunch of names

24  back -- one set of names they gave you back is these are visas

25  we revoked, right?

1    How long did that turnaround take, by the way?  You

2  gave them 6,000 names.  When did they give you back the names?

3    MR. WATSON:  The names came back as they completed

4  their activities on specific spreadsheets.

5    THE COURT:  What was the time lag for the first

6  rolling production?

7    MR. WATSON:  There was, I would estimate, within a

8  weekly cadence of responses that occurred for at least three

9  weeks.

10    THE COURT:  So we basically have another three weeks

11  of work at the State Department?

12    MR. WATSON:  I believe that's accurate.

13    THE COURT:  So they send you back a list of names of

14  people that you had sent them, and here people who were in

15  status, their visas were fine, but now State has revoked them,

16  right?

17    MR. WATSON:  There were some, yes.

18    THE COURT:  How many of those were there?

19    MR. WATSON:  By rough order of magnitude, over 3,000.

20    THE COURT:  3,000 people?

21    MR. WATSON:  Yes, ma'am.

22    THE COURT:  Who were in status, they were going about

23  their days, you send a list to State, and State sends you a

24  list of 3,000 people and we're going to revoke their visa,

25  right?

1          MR. WATSON:  Yes, ma'am.

2          THE COURT:  They told you to terminate those people in

3   SEVIS, right?

4          MR. WATSON:  Yes, ma'am.

5          THE COURT:  Who else did they send back?

6          MR. WATSON:  Those with expired visas.

7          THE COURT:  And then there were people with expired

8   visas?

9          MR. WATSON:  Visas that are not valid, yes, ma'am.

10          THE COURT:  And so those people they didn't need to

11   revoke because they were already expired and they told you to

12   terminate in SEVIS, right?

13          MR. WATSON:  Yes, ma'am.

14          THE COURT:  Do you have any understanding whether

15   State reached out to any of those individuals before sending

16   the list back to you to say, "Hey, we're about to terminate

17   your visa," or, "Hey, why aren't you in status, why is this

18   expired," or, "Hey, just as a heads-up, you're about to be

19   getting, you know, a notice that you have been terminated from

20   SEVIS and we want you to have the opportunity to tell us why

21   you shouldn't have your visa revoked"?  Do you know if that

22   happened?

23          MR. WATSON:  I would defer to State on that.

24          THE COURT:  Can you and I both agree that since you

25   were getting these back within a week and within three weeks

1  total that there was no notice sent out?

2         MR. WATSON:  I think that's a case-by-case assessment.

3         THE COURT:  Mr. Walker, are you aware as to whether or

4  not State sent a notice to anyone?

5         MR. WALKER:  I'm not aware, Your Honor.  I want to

6  clarify one point on the discussion that was just had.  I just

7  wanted to clarify that when we're talking about the State

8  Department revoking visas, we're talking about the State

9  Department revoking a travel visa to travel into the United

10  States, not status.

11         THE COURT:  Okay.  So they were still in status?

12         MR. WALKER:  Yes, ma'am.

13         THE COURT:  Even though they were still in status and

14  validly here on status, the State Department sent them back to

15  you and told you to terminate them in SEVIS?

16         MR. WALKER:  Yes.

17         THE COURT:  All right.  Plaintiff's counsel, did

18  Mr. Patel receive any notice from State that his visa was being

19  revoked or he was about to be terminated?

20         MR. BANIAS:  No, Your Honor.  His visa was expired at

21  the time this all happened.

22         THE COURT:  He was in status?

23         MR. BANIAS:  Yes, Your Honor.

24         THE COURT:  It's okay if your visa is expired because

25  a visa just gets you into the country.  The question is whether

1    or not you're in status?

2           MR. BANIAS:  Correct, Your Honor.  He had legally and

3    properly changed his status after entering the country.

4           THE COURT:  Got it.  Your represent a number of these

5    plaintiffs, right?

6           MR. BANIAS:  Yes, Your Honor.

7           THE COURT:  How many do you represent about,

8    approximately?

9           MR. BANIAS:  Probably about 125.

10          THE COURT:  Of those, are you aware of State sending

11   or DHS or anyone sending them any kind of notice that these

12   actions were about to occur?

13          MR. BANIAS:  Not a single one.

14          THE COURT:  So then State sends you back the list, and

15   then what happens?

16          MR. WATSON:  We provided instructions to -- "we" being

17   National Security Division, working group counterthreat lead

18   development, provided instructions to the Student Exchange

19   Visitor Program.

20          THE COURT:  Say that again.  I wasn't listening.  I

21   apologize.

22          MR. WATSON:  The National Security Division

23   counterthreat lead development unit passed the list from the

24   Department of State to the Student and Exchange Visitor Program

25   to action termination in SEVIS.

1      THE COURT:  So what happened was State gives it back

2  to DHS and DHS says -- and State says terminate these people,

3  and then you do?

4      MR. WATSON:  Yes, ma'am.

5      THE COURT:  I want to go through some timeline here

6  for you so you can sort of help me out with this.

7      MR. WATSON:  Yes, ma'am.

8      THE COURT:  Does he have a copy of the administrative

9  record?

10     MR. WALKER:  It's right here in front of him.

11     THE COURT:  Sir, the first email I see in the

12  administrative record is from Tuesday, April 1, 2025 at

13  4:58 p.m.  Do you see that?

14     MR. WATSON:  Yes, ma'am.

15     THE COURT:  And you sent it to Shane Meyers?

16     MR. WATSON:  Yes, ma'am.

17     THE COURT:  Who is Shane?

18     MR. WATSON:  He is the acting principal deputy

19  assistant secretary.

20     THE COURT:  For?

21     MR. WATSON:  The Department of State.

22     THE COURT:  So you send this list to State of 735

23  names.  This is part of the 6,000 names.  This would have been

24  one batch?

25     MR. WATSON:  Yes, ma'am.

1        THE COURT:  And you send this to him April 1, 2025 at

2   4:58 p.m.?

3        MR. WATSON:  Yes, ma'am.

4        THE COURT:  Okay.  And then if you look down, there is

5   an email on April 2nd, 2025 at 3:35 p.m. from someone at State

6   to someone at DHS.  Do you see that?

7        MR. WATSON:  No, ma'am.

8        THE COURT:  If you go to page -- at the bottom you

9   will see AR023.

10        MR. WATSON:  Yes, ma'am.

11        THE COURT:  So you see that on April 2nd, 2025, 3:35

12   p.m., someone from State sends an email to someone from DHS.

13        Do you see that?

14        MR. WATSON:  Yes, ma'am.

15        THE COURT:  Okay.  So this would be less than 24 hours

16   after you sent your email to Mr. Meyers, right?

17        MR. WATSON:  Appears to be the case, yes, ma'am.

18        THE COURT:  And in your email, you said, "Here is 735

19   foreign students submitted for your review and any action

20   deemed appropriate," right?

21        MR. WATSON:  Yes, ma'am.

22        THE COURT:  And the reason I have this email from you,

23   this particular email, is because Mr. Patel, the plaintiff in

24   this case, came up in this spreadsheet, right?

25        MR. WALKER:  We have unredacted that portion.

 1            THE COURT:  And then he responds within less than

 2    24 hours, "We have run the delta data against our systems.  The

 3    first tab lists individuals with valid visas.  How would you

 4    like us to prioritize revocation of these visas?"

 5            Do you see that?

 6            MR. WATSON:  I do.

 7            THE COURT:  The second tab is, "Students without a

 8    valid visa, we request that DHS terminate SEVIS status for

 9    these individuals, as there is no valid visa for us to revoke

10    and they are admitted under duration of status."

11            Do you see that?

12            MR. WATSON:  I do.

13            THE COURT:  So then someone at Homeland Security

14    Investigations -- is that DHS or is that State, National

15    Security Division?

16            MR. WATSON:  That's DHS.

17            THE COURT:  So someone sends back -- that's not you

18    though, right?

19            MR. WATSON:  That's correct.

20            THE COURT:  So someone at State, the division chief --

21    who is the division chief?

22            Mr. Walker, why is this redacted?

23            MR. WALKER:  We have redacted the level of certain

24    employees.  Some are not redacted, but it's just a privacy

25    interest.

1          THE COURT:  Well, you know I could go online and find

2   out who the division chief is, right?  You can assume I have

3   asked my clerk to do that.  So you want to just tell me the

4   name?

5          MR. WALKER:  I don't know that, Your Honor.  It may or

6   may not be online.

7          THE COURT:  Who was it?

8          Oh, Mr. Hammer.  Robert Hammer would be the person who

9   communicated back to you.

10          MR. WATSON:  This Exhibit 17?

11          THE COURT:  Yeah.

12          MR. WATSON:  Well, the division chief is not me.

13          THE COURT:  No, no, no.  I'm sorry.  Someone responded

14   to --

15          MR. WATSON:  Yes, that is a subordinate employee

16   within the National Security Division.

17          THE COURT:  Okay.  And that person sent back the

18   response on April 2nd, 2025 at 3:50 p.m.  Do you see that?

19          MR. WATSON:  I do.

20          THE COURT:  So a question goes out.  We have 700 names

21   here, because the list from April 2nd, 2025 is also the list --

22   the same list from the day before because it also contains

23   Mr. Patel, right?

24          MR. WATSON:  I believe so.

25          THE COURT:  Thank you.  So with less than 24 hours,

1    someone has run this list through something, and says, "We have

2    people with a valid visa.  How would you like us to prioritize

3    revoking these visas?"

4         And then we have another person -- we have groups

5    without valid visas because they are expired.  And State says,

6    "Terminate both of these," right?  "Terminate the people

7    without the valid visa from SEVIS," right?

8         MR. WATSON:  Yes, ma'am.

9         THE COURT:  State does not ask that the people in the

10   first tab be terminated from SEVIS, right?

11        MR. WATSON:  I don't see that in the instruction.  I

12   don't see that in the email.

13        THE COURT:  All right.  And then somebody, Mr. Hammer,

14   within 15 minutes of careful thought and consideration, says,

15   "Please terminate everyone in SEVIS," right?

16        MR. WATSON:  Ma'am, that's not Mr. Hammer.  He doesn't

17   serve as the division chief.

18        THE COURT:  Well, whoever.  Someone at National

19   Security Division, Homeland Security Investigations division

20   chief -- and, Mr. Walker, I want a name of that by the time we

21   leave today, so if someone can get on that -- sends, after

22   careful consideration for 15 minutes, "Terminate everybody,"

23   right?

24        MR. WATSON:  Yes, ma'am.

25        THE COURT:  Can you and I agree that nowhere in this

1   entire process has anyone done an individualized determination

2   of any of these individuals before their names were terminated

3   in SEVIS?

4          MR. WATSON:  When you say "individualized

5   determination," that is --

6          THE COURT:  I mean no one looked at Mr. Patel's case

7   and said, "Yeah, here is somebody who should no longer be in

8   the United States," right?

9          MR. WATSON:  Ma'am, my team --

10         THE COURT:  To your knowledge, no one did an

11  individualized assessment as to whether or not Mr. Patel should

12  be or should not be in the United States, right?

13         MR. WATSON:  Individualized assessment of every

14  person?

15         THE COURT:  Yes.

16         MR. WATSON:  Each record was scrutinized based on the

17  criminal history.

18         THE COURT:  Yeah, but Mr. Patel got a citation for

19  reckless driving, which is a misdemeanor in Texas.  By the way,

20  it's also a misdemeanor in Virginia.  If you go over 70 miles

21  an hour, you actually have a criminal defense case against you.

22  Don't ask how I know that.

23         And he was pulled over for, quote-unquote, "reckless

24  driving," which just meant he was speeding, and no charges were

25  ever brought.  In fact, when I looked at his record that you

1    sent me in the administrative record, it said very clearly,

2    "case dismissed," right?

3         MR. WATSON:  Following a complaint being filed and him

4    meeting the terms of the agreement, yes.

5         THE COURT:  Well, can you and I both agree that if we

6    deported every single individual in this country who has been

7    tagged for speeding, there would be very few people left and

8    almost all of them would not have driver's licenses?

9         MR. WATSON:  I don't know that we have the capacity at

10   this present time to do that, Your Honor.

11        THE COURT:  But you and I both know that Mr. Patel is

12   not a criminal, right?  And anyone looking at the record would

13   know that he's not a criminal, right?

14        In fact, Mr. Patel tells me, and I assume you have no

15   reason to not believe him, that he had disclosed the speeding

16   ticket at least two times to government agencies when seeking

17   to keep in status.  He was quite forthright about it, and,

18   obviously, the government people said, "Fine.  People speed.

19   Let's all move on."  They weren't tagged.

20        By the way, did you know that?  Was there an

21   individualized assessment with Mr. Patel where you knew or

22   State knew that the government, the United States government

23   had already assessed this speeding ticket and had found it not

24   to be a reason to take him out of status?

25        MR. WALKER:  Just to clarify, Your Honor, Mr. Patel

1    was not taken out of status.  His SEVIS record was terminated.

2           THE COURT:  But upon termination, the law they cite me

3    says he has to leave the country.

4           MR. WALKER:  Your Honor, one of the questions you

5    wanted us to answer today was, was Mr. Patel lawfully present

6    in the United States?  Is he now and was he at the time that

7    his SEVIS record was terminated?  The answer to that is yes.

8           THE COURT:  Did the termination require him upon

9    termination to leave the country immediately?

10          MR. WALKER:  It did not.  He was lawfully present in

11   the United States.

12          THE COURT:  No, no, no.  You're not answering my

13   question.  I want to know what the effect is of a termination

14   of SEVIS.  They are telling me based on the law that the actual

15   law is he has to either leave the country immediately or get it

16   changed somehow, which I assume is legally, through the court

17   system.

18          MR. WALKER:  No.  Upon the termination of a record in

19   SEVIS, he remains lawfully present in the United States.

20          THE COURT:  So what are his obligations?

21          MR. WALKER:  It depends on how the school reacts to

22   the termination of the record in SEVIS.  The school may

23   require --

24          THE COURT:  We're going to get into the merits of this

25   later, because I know that they disagree with everything that

1    you're saying right now.  Let's keep on the non-process process

2    here for a bit.

3            Mr. Patel and 6,000 other people with 15 minutes of

4    consideration by people after they hear from State and less

5    than 24 hours of consideration by State, thousands of people

6    get terminated from SEVIS, right?

7            MR. WATSON:  Yes, ma'am.

8            THE COURT:  Students?

9            MR. WATSON:  Yes, ma'am.

10           THE COURT:  Students who are in the country studying,

11   right?

12           MR. WATSON:  Yes, ma'am.

13           THE COURT:  A number of them, if not thousands of

14   them, who were legally in status and had no issue with their

15   being in the country, right?

16           MR. WATSON:  To the best of my knowledge.

17           THE COURT:  To the best of your knowledge, right?

18           MR. WATSON:  Yes.

19           THE COURT:  Okay.  Let's do a quiz today.  Anyone know

20   where the due process clause from the Fifth Amendment comes

21   from?  Anybody?  Nobody knows where the due process clause or

22   the Fifth Amendment comes from?  Not my clerks?  We're going to

23   have discussions afterwards.

24           It comes from Article -- Chapter, Article, whatever

25   you want to the call it, 39 of the Magna Carta.  That's where

1    it first appeared.  It appeared as the law of the land.  It was

2    amended in the 1300s to be due process, but the due process

3    comes from the Magna Carta.

4         Anyone want to remind me what century the Magna Carta

5    was in?  It was in the 1200s.  So when I say, or when the

6    courts say due process is important, we're not unhinged, we're

7    not radicals; we are literally trying to enforce a process

8    embodied in probably the most significant document with respect

9    to peoples' rights against tyrannical government oppression.

10   That's what we're doing here.  Okay?

11        I'm not on a lark questioning why students who have

12   been here legally, who paid to be in this country by paying

13   their universities, who have studied to try to become better

14   people if they stay in the U.S. or when they go back to their

15   homes or countries, people who are trying or months away from

16   getting engineering degrees, and they are cut off with less

17   than 24 hours of consideration and no notice whatsoever.

18        So, Mr. Walker, we're going to have a long discussion

19   about that.

20        Mr. Watson, is there anything else -- and I may have

21   questions for you later on.  Is there anything else about the

22   process that I should know about?

23        MR. WATSON:  Your Honor, I would just note that with

24   the terminations, that is a red flag, and it is a red flag to

25   determine if the student is still in compliance with their F

1  and/or M visa.

2          THE COURT:  But you didn't have to terminate people in

3  SEVIS to do that, right?  You could have sent a letter to all

4  the universities that had these students and said, "These

5  people have come up on a hit, you may want to check them out,"

6  because termination is -- well, all right.  I understand your

7  view.  Thank you.

8          Mr. Watson, I will say I know that this isn't pleasant

9  for you, because you're on the end of a bunch of questions, but

10  I have to say I have found you both last hearing and this

11  hearing to be very on top of what's going on and very

12  forthright and very helpful.  So thank you.

13          MR. WATSON:  Thank you, Your Honor.

14          THE COURT:  You can be seated.  I can't promise you

15  won't be up here again.

16          MR. WALKER:  Your Honor, the name you asked for is

17  Antoine Rines (ph).

18          THE COURT:  Thank you.

19          Can I get the plaintiffs up here.  Actually, let me do

20  this.  Let me go through these questions I had for you.

21          Since I'm from Kentucky, you'd probably be doing a lot

22  better with me if your name was "Maker's Mark."

23          MR. WALKER:  I'm also from Kentucky.

24          THE COURT:  Where are you from?

25          MR. WALKER:  I was born in Louisville and went to

1    school in Mount Washington, just outside of Louisville.

2         THE COURT:  I lived in Louisville.  What made you

3    leave KY?

4         MR. WALKER:  My dad got transferred down to Georgia,

5    so we moved to Georgia, but always went back to Louisville to

6    visit Mamma and Pappa.

7         THE COURT:  Awesome.  Was your dad in the military?

8         MR. WALKER:  No, he works in packaging.

9         THE COURT:  Okay.  Well, always happy to see a

10   Kentuckian.  I don't understand how they called you Johnny

11   Walker if you were born in Kentucky, but --

12        MR. WALKER:  There is a lot of brown liquors involved.

13        THE COURT:  So first question.  In your view, is the

14   plaintiff lawfully in the United States, assuming that I had

15   not entered my TRO?

16        MR. WALKER:  Yes, Your Honor.  The answer to that

17   question is yes.  Based on the information currently available

18   to ICE, Mr. Patel is lawfully present in the United States and

19   was at the time that his SEVIS record was terminated.

20        THE COURT:  Is plaintiff currently subject to

21   immediate detention or removal from the United States?

22        MR. WALKER:  No.  Again, I have to provide the caveat

23   that based on the information currently available to ICE, we

24   don't -- it's a law enforcement agency and they are obviously

25   sensitive about hampering their ability to enforce the law.

 1          THE COURT:  But based on everything we know in the

 2   record to date.

 3          MR. WALKER:  Based on everything ICE knows right now,

 4   he is not subject to immediate detention or removal.

 5          THE COURT:  Okay.  It seems like we have gone through

 6   four.  Seems like we have gone through five.

 7          Number six, has the government identified any error in

 8   any of its recent SEVIS termination actions?

 9          MR. WALKER:  Yes, and I think this gets to the quality

10   control effort that some of the other questions deal with and

11   that Your Honor addressed at the prior hearing.  The quality

12   control effort that Mr. Watson was talking about was to make

13   sure that the identity of the individual associated with the

14   SEVIS record matched the individual associated with the NCIC

15   hit.

16          THE COURT:  If we have a John Smith, we need to make

17   sure that it's the right John Smith.

18          MR. WALKER:  Precisely.  So the government has

19   completed that process.  It identified 23 false matches between

20   the SEVIS record and the NCIC record, and it has remedied those

21   false hits.

22          THE COURT:  What is the government's purpose in

23   changing a student's SEVIS record from active to terminated?

24          MR. WALKER:  I think Mr. Watson addressed this a

25   little bit.  It is intended as an investigative red flag for

1    either the university or the school or some other government

2    agency to follow up on.

3            THE COURT:  Well, where can I go -- if I'm a student

4    counselor and I get a termination that says Mr. Patel's SEVIS

5    record has been terminated, where would I go to find out what

6    it means -- what that means?

7            Like where would I go to know that he was still in the

8    country lawfully and that he was still in status?

9            MR. WALKER:  I think there are designated school

10   officials, so the school official has a contact at ICE field

11   offices that they can go to to follow up on those questions.

12           THE COURT:  But there is no document?  I mean, there

13   must be a document somewhere in the world that says "here is

14   the effect of being terminated in SEVIS."

15           MR. WALKER:  There is the study in State's website

16   that the plaintiff have cited a little bit that has some

17   information about SEVIS and the effect of a termination.

18           THE COURT:  Where is that in my papers so I can look

19   at it and talk to you about it?

20           MR. WALKER:  It's in their brief and there is some

21   perma CC links to it.  I know that they have sort of snipped

22   some images from it, so if you scan their brief for that, I

23   think you would find it.

24           What we have noted is what that study in State's cite

25   says is that a termination of a SEVIS record could indicate a

1  change in status.  It does not necessarily indicate a change in

2  status.  The website also notes that a termination in SEVIS is

3  not necessarily negative.  A termination in SEVIS can be done

4  for administrative reasons that are not necessarily negative.

5          THE COURT:  Where am I looking?

6          MR. WALKER:  We sort of pulled these quotes in our

7  brief.  The website is mostly visible through clicking on it.

8          Plaintiffs have captured some images of it on page 11

9  of their brief.  So there is this thing that provides some

10  reasons for termination and duration of status.  What we

11  pointed out here is that this particular termination reason is

12  associated with a termination for a violation of status, but,

13  again, a termination of a SEVIS record is not necessarily

14  indicative of a lack of status.

15          THE COURT:  I didn't see, and maybe I'm wrong, but I

16  didn't see in SEVIS where it says -- my understanding is that

17  SEVIS just says "active" or "terminated."  It doesn't say why

18  it was terminated; is that right?

19          MR. WALKER:  No.  There is a list of drop-down items

20  that you can select as to why it was terminated.

21          THE COURT:  What was the drop-down item for Mr. Patel?

22          MR. BANIAS:  Your Honor, it said "failure to maintain

23  status, criminal hit and/or visa revocation."

24          THE COURT:  Sounds pretty bad to me.

25          MR. WALKER:  I acknowledge that that particular choice

1   that was made to describe this hit was not necessarily the

2   right one to describe it.

3        THE COURT:  Maybe that happened because this was a

4   rushed process and maybe -- and this is absolutely no criticism

5   to Mr. Watson or his group at all -- maybe a little bit more

6   care should have been taken.

7        MR. WALKER:  I can sort of provide -- and we don't

8   know who actually undertook this process.  It could have been a

9   contractor.  It could have been a lower-level employee.  The

10  best guess I can give, Your Honor, and this is based on no

11  information whatsoever that I have actually obtained firsthand,

12  the best guess that I have is that that's sort of a catchall

13  option, and based on the SEVIS website, that is the only option

14  that sort of has a fillable field associated with it where ICE

15  could put in the information about the NCIC hit.

16       THE COURT:  But a violation, it says, has no grace

17  period.

18       MR. WALKER:  Again, that is for a termination that is

19  for a failure to maintain status.  Mr. Patel was --

20       THE COURT:  It says "termination for any violation of

21  status," and you just told me that his termination said

22  "failure to maintain status."

23       MR. WALKER:  Yes.  That was not the most descriptive

24  option to select.

25       THE COURT:  Mr. Walker, I have to say I'm pretty

1  impressed with you right now.  I think have you been

2  forthright.  You have gotten me the administrative record.

3  You're answering my questions.  Thank you.  So this is not

4  directed at you.  All right.

5       But what happens when we do things willy-nilly with

6  very little time, and certainly with zero due process, is that

7  mistakes happen, a wrong catchall is used, and the next thing

8  somebody is being told or would know if they went to the

9  website that they have no grace period and that they must

10  either apply for reinstatement immediately or leave the U.S.

11  immediately.

12       And then what happens -- now, if someone had sent, for

13  example, Mr. Patel a letter that says, "We're going to

14  terminate you for violation of status," Mr. Patel or his

15  lawyers would have said, "No, no, no, I'm in status," and then

16  this wouldn't have happened.

17       And the reason that I'm particularly concerned about

18  this, Mr. Walker, aside from the utter lack of concern for

19  human individuals who we have invited into our country and who

20  have communities richer by being students who have contributed

21  to our colleges and who have paid our colleges, the reason I'm

22  concerned and particularly troubled is because those

23  plaintiffs' lawyers, like all lawyers, have to get paid.

24       And so now we have got thousands of people who are

25  having to pay plaintiffs' attorneys to have litigation, to file

```
 1   briefs, to appear in court, to prepare for court, to get the
 2   information, and that's not cheap, right.  And all of this
 3   could have been avoided if individuals had taken a beat, and
 4   instead of just rushing things -- and, again, I'm not
 5   criticizing Mr. Watson at all for this -- but that's not
 6   happening.  And so instead we end up with -- how many cases are
 7   there now nationwide?
 8             MR. BANIAS:  I think it's about 60.
 9             THE COURT:  60 cases, but about with hundreds of
10   plaintiffs, right?
11             MR. BANIAS:  There are a handful of group cases, yes,
12   Your Honor.
13             THE COURT:  You have 100 yourself, right?
14             MR. BANIAS:  I have two group cases with 100 people
15   total, yes, ma'am.
16             THE COURT:  We're taking up court time.  We're taking
17   up government time.  I imagine you have better things to do.  I
18   imagine Mr. Watson has better things to do.
19             All right.  Is there anything that you can say right
20   now, Mr. Walker, or anything that the government can do, so
21   that instead of having a gazillion or 60 judges have to rule on
22   60 motions, that we can sort of short-circuit this and maybe
23   start afresh?
24             MR. WALKER:  I'm happy to get to that, Your Honor.
25   With respect to Mr. Patel, so we filed with our brief last
```

1    night a new policy that ICE has issued with respect to

2    terminations of records in SEVIS.  It is at ECF 16-1.  It's

3    Exhibit A to our opposition to the motion for preliminary

4    injunction.

5          THE COURT:  One second.  This is to all SEVP

6    personnel.  Who is SEVP?

7          MR. WALKER:  It's the Student and Exchange Visitor

8    Program.

9          THE COURT:  This is dated April 26, 2025.  So explain

10   this to me.

11         MR. WALKER:  This was issued over the weekend, and

12   this provides specific guidance to SEVP personnel about when to

13   terminate a record in SEVIS.  This document does retain ICE's

14   broad discretion, which it does always have and continues to

15   have to terminate records at its discretion, but the specific

16   guidance provided here, you will note these bullet points here,

17   those do not apply to Mr. Patel.

18         There is the failure to comply with the terms of

19   nonimmigrant status, which does not apply to Mr. Patel.  The

20   one I want to highlight is the visa revocation issue.

21         If you look at the middle paragraph here, the second

22   of the three.  "If State revokes a nonimmigrant visa effective

23   immediately, SEVP may terminate the nonimmigrant's SEVIS record

24   based on the visa revocation with immediate effect.  As such, a

25   revocation can serve as a basis for removability under Section

237(a)(1)(B) of the INA.  SEVP should not, however, terminate a
nonimmigrant's SEVIS record on this basis until it has
confirmed that State has revoked the visa."

        And you will recall, Your Honor, when you were looking
at the administrative record with Mr. Watson, Mr. Patel fell
into a class of individuals who had not had a visa revoked.  He
had -- I think this was sort of described at the prior hearing.
Mr. Patel started his studies when he was under an H-4 visa, as
the family member of an H-1 B worker.

        He then traveled out of the United States and returned
to the United States on a tourist visa, an H-2 visa.  Those
last for 45 days.  While in the United States on a tourist
visa, he converted to an F status.  So he got the status to
remain as a student in the United States under F-1.

        So his tourist visa expired by its terms, and at the
time that this review was conducted, he had no visa to revoke.
Because he had no visa to revoke, this visa revocation basis
for terminating a SEVIS record would not apply to him.

        THE COURT:  I don't see anything in here about a hit
on the NCIC system.  That's not a hit, right?  That's not a
basis?

        MR. WALKER:  That's not in here.  I don't want to say
-- I can't tell you that it would be outside of ICE's
discretion to terminate a record based on an NCIC hit.  But
here what you had was a colloquy with the State Department

1    where they returned some information based on their visa

2    records.  They noted that Mr. Patel had no visa to revoke, but

3    the current policy, as of this weekend, is that the visa basis

4    for a termination of a SEVIS record has to be a revoked visa.

5           THE COURT:  So absent a TRO, preliminary injunction,

6    Mr. Patel, because he's here in status and has not -- does not

7    have a visa because he's here in status legally, he would

8    remain active absent something happening, you know, we found

9    out that while he was here he did something actually illegal?

10          MR. WALKER:  I have discussed this with Mr. Watson.

11   Based on the information currently available to ICE at this

12   time, absent a TRO or injunction, Mr. Patel would remain active

13   in SEVIS.

14          THE COURT:  Okay.  So I guess I still don't

15   understand.  Let's say that we had Mr. Smith, his visa -- can

16   someone have a valid visa and be in country status -- in the

17   country in status, and so if you revoked their visa, they would

18   still be in status?

19          MR. WALKER:  Yes.  I think, as this notes, a visa

20   revocation can be a basis for removability, but it's two

21   separate things.  State Department revokes the travel visa, but

22   it would require removal proceedings to eliminate the status

23   and actually accomplish the removal.

24          THE COURT:  So I still do not understand what happens

25   if I'm terminated in SEVIS.  What is the practical -- I mean, I

1    guess what I'm asking is -- this is helpful.  This tells me

2    when someone can be terminated.  What I'm more interested in

3    is, I'm a school counselor and it pops up that Mr. Patel's

4    SEVIS record has been terminated, or Mr. Smith's.

5            So far the only thing I understand from you all is

6    that it's a red flag, the person does not have to leave

7    immediately, correct?

8            MR. WALKER:  That's correct.

9            THE COURT:  Okay.  And then can the person go to

10    classes?

11            MR. WALKER:  That's up to the school.  The school may

12    see that hit and tell the individual they can't go to classes.

13    I know that has happened in some cases, but upon follow-up by

14    the designated school official with their ICE field office that

15    could clarify that the person does in fact have status and can

16    attend classes.

17            THE COURT:  We have to assume that the person at the

18    ICE field office actually knows what's going on.

19            MR. WALKER:  I think that's fair to assume that the

20    person in the ICE field office would have access to the

21    individual's information.

22            THE COURT:  You and I have different assessments of

23    what's fair to assume that government officials have these days

24    with respect to updated knowledge.  We have that disagreement,

25    that's fine.

1          I'm going to let you obviously talk as long as you

2  want, but before I get to plaintiff's counsel on this effective

3  termination issue.

4          MR. WALKER:  I think the primary things I wanted to

5  do, Your Honor, was talk about that policy that I have been

6  able to describe to you and answer Your Honor's questions from

7  the prior hearing.

8          THE COURT:  I'm not sure I got through all of them.  I

9  think we have actually.  Thank you, sir.

10         Look, I know that I think technically, you know, the

11 fact that they will agree to keep Mr. Patel in active status

12 pending some other information coming out, I suppose that -- my

13 clerk found a Supreme Court case that said that government

14 making something moot does not necessarily -- I mean, giving

15 the relief does not necessarily make something moot, but I'm

16 kind of at a loss as to what I'm still doing with respect to

17 Mr. Patel if we have a representation from the government -- I

18 guess I could say -- I guess I could get a representation from

19 the government that if they are going to do anything else with

20 Mr. Patel, he be given two weeks or 30 days notice, but other

21 than that, I'm not sure what else to do for you.

22         MR. BANIAS:  Your Honor, we made various arguments

23 about why it's arbitrary and capricious.

24         THE COURT:  I think we can all agree it was arbitrary

25 and capricious.  My question to you is, yeah, this was not

1    ideal by any stretch of the imagination.  It still boggles my

2    mind that we're firing tens of thousands of federal workers on

3    no notice and then spend -- take 10 or 20 of them to run a

4    bunch of names through a database to see if they are students

5    if they have a speeding record.

6          You know what, it's not my call.  But my question is

7    with respect specifically to Mr. Patel, I mean, he's on active.

8    He's going to remain on active, pending any new information.

9    You know, so I'm not sure what else to do for you.

10          MR. BANIAS:  Your Honor, we think that he's definitely

11    subject to termination under this, quote, "new policy."

12          THE COURT:  I can get a representation from the

13    government that absent new information, he's not going to be

14    terminated, and that if they plan to terminate him, he gets

15    notice.  I don't know what else I could do for you.

16          MR. BANIAS:  Your Honor, one of our arguments is that

17    this is ultra vires and that this new policy is even more ultra

18    vires.  If this Court rules this an ultra vires act, it

19    protects my client because they can't go and use power they

20    don't have again.

21          THE COURT:  But I don't need to go that far.  Look,

22    I'm not going to wade into whether or not the policy makes

23    sense or doesn't if I don't need to.  Okay.  And I'm just not

24    going to do it.  So I think if Mr. Walker and you want to come

25    up with some language that Mr. Walker can give me or some

1   representation that the government will make, you know, that

2   Mr. Patel based on the current -- Mr. Walker, come up.  I think

3   you have already said.  In your understanding, based on the

4   current record, having Mr. Patel's NCIC status here, with

5   Mr. Watson here, your understanding, the government's position

6   is that under the new policy he is not subject to termination

7   based on what we know today?

8           MR. WALKER:  I have to provide caveats to this, Your

9   Honor.  I'm going to provide the caveats.  He's not subject to

10  termination for the visa revocation purpose on that policy, and

11  based on the information currently available to ICE at this

12  time, he would not be terminated absent a court order.  So

13  without a court order, he won't be.

14          THE COURT:  He can't say that he's not going to be

15  terminated at all, because they could come up -- I'm not going

16  to use Mr. Patel.  Let's say there's a Mr. Smith who is exactly

17  in your client's position, and Mr. Walker is saying the same

18  thing about Mr. Smith, and the reason Mr. Walker is saying that

19  and Mr. Watson is asking him to say that is because, you know,

20  Mr. Smith might have killed puppies while at school and we just

21  didn't know that, right.  So that's why there is that caveat.

22  He's never going to be able to not give you that caveat.

23          MR. WALKER:  One additional thing I want to add, Your

24  Honor, is that Mr. Patel is on the brink of finishing his

25  education.  I think he has his last final next week.  He's

1    graduating on the 15th, so his interests are in the very, very

2    immediate term.

3              MR. BANIAS:  If I may, Your Honor.

4              THE COURT:  He's in classes right now because I

5    entered the TRO that he could go to classes, right?

6              MR. BANIAS:  Yes, Your Honor.

7              THE COURT:  He's getting an engineering degree?

8              MR. BANIAS:  Information systems, Your Honor.

9              THE COURT:  Ironic.

10             MR. BANIAS:  He's also applied for postgraduate

11    optional practical training.  This is an application that will

12    allow him to work, because he's in a STEM major, for up to

13    three years within his field of study.  That's going to go to

14    United States Citizenship and Immigration Services.

15             THE COURT:  We can give -- Mr. Walker, can you work

16    with me so that I don't have to look at the entire policy,

17    which I'm quite confident you don't want me to do in

18    particular.  Can you guys come up with some language that we

19    will enter on the court docket about Mr. Patel specifically?

20    And your co-counsel wants to give you a note.

21             MR. WALKER:  I'm very happy to try that, Your Honor.

22    I can't promise we will be able to, but we will endeavor to do

23    that.

24             THE COURT:  I just want to make clear for the record

25    that I'm trying very hard to not enjoin an entire policy, and

 1    I'm trying very hard to get just one person relief.

 2            MR. WALKER:  I understand.

 3            THE COURT:  That's what I'm trying to do.

 4            MR. BANIAS:  Your Honor, we are happy to work with the

 5    government to agree to language.  We have been doing that for

 6    the last three weeks and we've gotten nowhere.

 7            THE COURT:  I'm telling Mr. Walker right now that

 8    based on what I have seen so far, he does not want me to issue

 9    a ruling in this case.  He really does not want me to issue a

10    ruling in this case.  He really, really, really -- I'm looking

11    at you and not Mr. Walker, and I assume Mr. Walker is paying

12    attention to me -- does not want me to issue a ruling in this

13    case.

14            MR. WALKER:  Loud and clear, Your Honor.

15            THE COURT:  I understand that your client is going to

16    have concerns and words and what you call it and what you all

17    say to your client is, you can add in the language that this is

18    not binding on the government as to anybody else, that this is

19    not conceding anything by government, and you tell your client

20    that they want to just keep Mr. Patel in the country and happy

21    so they can avoid me issuing a ruling which they will not like.

22            Okay.  And contrary to the belief of a number of

23    people, I am literate and I can actually write a long ruling

24    that explains in detail all the issues that I see with what's

25    happened here.

1          MR. WALKER:  Understood.

2          THE COURT:  You guys have a week to get that language

3    to me.  If you need more time, let me know.  If there is an

4    issue that you guys can't agree, before you file something,

5    email my chambers.  We'll have a quick call and we'll see where

6    to go from there.

7          The TRO expires on Thursday.  I assume, Mr. Walker,

8    you can represent that nothing is going to happen to Mr. Patel

9    while you two are working this out, right?

10          MR. WALKER:  Yes, Your Honor.

11          THE COURT:  Okay.  Thank you, everyone.

12      (Proceedings concluded at 11:00 a.m.)

13                         CERTIFICATE

14      I, Sonja L. Reeves, Federal Official Court Reporter in and
     for the United States District Court of the District of
15    Columbia, do hereby certify that the foregoing transcript is a
     true and accurate transcript from the original stenographic
16    record in the above-entitled matter and that the transcript
     page format is in conformance with the regulations of the
17    Judicial Conference of the United States.

18      Dated this 29th day of April, 2025.

19

20                         /s/ Sonja L. Reeves
                          SONJA L. REEVES, RDR-CRR
21                         FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**/**

**/s** [1] - 46:20

**0**

**0.5** [1] - 14:7

**1**

**1** [3] - 12:1, 19:12, 20:1
**1,000** [1] - 11:4
**1.3** [7] - 9:11, 9:19, 10:23, 11:13, 11:15, 11:22, 14:3
**10** [8] - 7:22, 8:1, 8:2, 8:5, 9:17, 10:23, 11:16, 42:3
**10,000** [4] - 12:16, 12:17, 12:18, 13:22
**100** [2] - 36:13, 36:14
**100th** [1] - 12:2
**10333** [1] - 1:17
**1050** [1] - 1:17
**10:05** [2] - 1:11, 2:1
**11** [1] - 33:8
**11:00** [2] - 1:11, 46:12
**1200s** [1] - 28:5
**125** [1] - 18:9
**13,900** [1] - 11:20
**1300s** [1] - 28:2
**15** [3] - 23:14, 23:22, 27:3
**15th** [1] - 44:1
**16,000** [5] - 11:19, 11:22, 12:3, 12:6, 12:14
**16-1** [1] - 37:2
**17** [1] - 22:10
**1:25-cv-01096-ACR** [1] - 1:5
**1st** [1] - 3:16

**2**

**20** [8] - 7:22, 8:1, 8:2, 8:6, 9:17, 10:24, 11:16, 42:3
**20001** [1] - 1:25
**20004** [1] - 1:21
**2025** [10] - 1:11, 3:16, 19:12, 20:1, 20:5, 20:11, 22:18, 22:21, 37:9, 46:18
**23** [1] - 31:19
**237(a)(1)(B** [1] - 38:1
**24** [5] - 20:15, 21:2, 22:25, 27:5, 28:17

**25-1096** [1] - 2:2
**26** [1] - 37:9
**29** [1] - 1:11
**29403** [1] - 1:15
**29th** [1] - 46:18
**2nd** [4] - 20:5, 20:11, 22:18, 22:21

**3**

**3,000** [3] - 15:19, 15:20, 15:24
**30** [1] - 41:20
**333** [1] - 1:24
**39** [1] - 27:25
**3:35** [2] - 20:5, 20:11
**3:50** [1] - 22:18

**4**

**45** [1] - 38:12
**4:58** [3] - 3:16, 19:13, 20:2

**6**

**6,000** [3] - 15:2, 19:23, 27:3
**6,400** [4] - 12:15, 13:24, 13:25, 14:3
**60** [4] - 36:8, 36:9, 36:21, 36:22
**601** [1] - 1:20
**602** [1] - 1:14

**7**

**70** [1] - 24:20
**700** [1] - 22:20
**735** [2] - 19:22, 20:18
**77042** [1] - 1:17

**A**

**a.m** [4] - 1:11, 2:1, 46:12
**ability** [1] - 30:25
**able** [3] - 41:6, 43:22, 44:22
**above-entitled** [1] - 46:16
**absence** [1] - 13:12
**absent** [5] - 39:5, 39:8, 39:12, 42:13, 43:12
**absolutely** [1] - 34:4
**access** [1] - 40:20
**accomplish** [1] - 39:23
**accurate** [2] - 15:12,

46:15
**acknowledge** [1] - 33:25
**act** [1] - 42:18
**acting** [2] - 8:17, 19:18
**Acting** [1] - 1:6
**action** [4] - 8:24, 9:2, 18:25, 20:19
**Action** [1] - 2:2
**actions** [2] - 18:12, 31:8
**active** [7] - 31:23, 33:17, 39:8, 39:12, 41:11, 42:7, 42:8
**activities** [3] - 12:20, 12:22, 15:4
**actual** [1] - 26:14
**add** [2] - 43:23, 45:17
**addition** [1] - 10:17
**additional** [1] - 43:23
**addressed** [2] - 31:11, 31:24
**administrative** [8] - 3:11, 3:24, 19:8, 19:12, 25:1, 33:4, 35:2, 38:5
**admitted** [1] - 21:10
**advisor** [1] - 2:12
**Affairs** [1] - 13:16
**affairs** [1] - 13:17
**afford** [1] - 9:16
**afresh** [1] - 36:23
**afterwards** [1] - 27:23
**agencies** [1] - 25:16
**agency** [2] - 30:24, 32:2
**agree** [7] - 16:24, 23:25, 25:5, 41:11, 41:24, 45:5, 46:4
**agreement** [1] - 25:4
**ahead** [2] - 8:22, 13:8
**AKSHAR** [1] - 1:3
**Akshar** [1] - 2:2
**alien** [6] - 3:19, 3:21, 4:4, 4:22, 5:13, 10:20
**allow** [1] - 44:12
**almost** [1] - 25:8
**alone** [2] - 7:4, 7:8
**amended** [1] - 28:2
**Amendment** [2] - 27:20, 27:22
**America** [1] - 2:22
**American** [1] - 2:20
**ANA** [1] - 1:10
**analysis** [2] - 12:7, 13:5

**analysts** [1] - 8:3
**Andre** [3] - 2:10, 3:16, 5:7
**Annemarie** [1] - 2:13
**annually** [1] - 10:5
**answer** [4] - 26:5, 26:7, 30:16, 41:6
**answering** [2] - 26:12, 35:3
**Antoine** [1] - 29:17
**Antoinette** [1] - 3:1
**apologize** [1] - 18:21
**appear** [1] - 36:1
**appeared** [2] - 28:1
**application** [1] - 44:11
**applied** [1] - 44:10
**apply** [4] - 35:10, 37:17, 37:19, 38:18
**appropriate** [3] - 7:16, 8:21, 20:20
**April** [10] - 1:11, 3:16, 19:12, 20:1, 20:5, 20:11, 22:18, 22:21, 37:9, 46:18
**AR023** [1] - 20:9
**arbitrary** [2] - 41:23, 41:24
**area** [1] - 5:10
**arguments** [2] - 41:22, 42:16
**Armstrong** [2] - 13:10, 13:13
**arrested** [2] - 6:3, 6:6
**Article** [2] - 27:24
**aside** [2] - 8:8, 35:18
**assessed** [1] - 25:23
**assessment** [4] - 17:2, 24:11, 24:13, 25:21
**assessments** [1] - 40:22
**assist** [1] - 2:10
**assistant** [2] - 3:17, 19:19
**associate** [2] - 2:12, 8:18
**associated** [4] - 31:13, 31:14, 33:12, 34:14
**assume** [8] - 22:2, 25:14, 26:16, 40:17, 40:19, 40:23, 45:11, 46:7
**assuming** [1] - 30:14
**Atkinson** [1] - 2:19
**attached** [1] - 3:20
**attend** [1] - 40:16
**attention** [1] - 45:12
**attorney** [1] - 5:2

**Attorney's** [1] - 2:9
**attorneys** [1] - 35:25
**available** [4] - 30:17, 30:23, 39:11, 43:11
**Avenue** [3] - 1:14, 1:17, 1:24
**avoid** [1] - 45:21
**avoided** [1] - 36:3
**aware** [4] - 10:21, 17:3, 17:5, 18:10
**awesome** [1] - 30:7

**B**

**bad** [1] - 33:24
**Banias** [2] - 1:13, 2:6
**BANIAS** [20] - 1:14, 2:6, 17:20, 17:23, 18:2, 18:6, 18:9, 18:13, 33:22, 36:8, 36:11, 36:14, 41:22, 42:10, 42:16, 44:3, 44:6, 44:8, 44:10, 45:4
**based** [25] - 4:17, 7:4, 7:14, 7:15, 11:9, 12:20, 14:12, 14:14, 24:16, 26:14, 30:17, 30:23, 31:1, 31:3, 34:10, 34:13, 37:24, 38:24, 39:1, 39:11, 43:2, 43:3, 43:7, 43:11, 45:8
**basis** [6] - 37:25, 38:2, 38:17, 38:21, 39:3, 39:20
**batch** [3] - 11:8, 11:10, 19:24
**batches** [1] - 12:25
**beat** [1] - 36:3
**become** [1] - 28:13
**BEFORE** [1] - 1:10
**belief** [1] - 45:22
**below** [1] - 12:17
**Ben** [1] - 3:1
**best** [4] - 27:16, 27:17, 34:10, 34:12
**better** [2] - 28:13, 29:22, 36:17, 36:18
**between** [4] - 7:22, 9:23, 12:8, 31:19
**big** [1] - 7:19
**binding** [1] - 45:18
**bit** [4] - 27:2, 31:25, 32:16, 34:5
**BLOND** [1] - 14:7
**boggles** [1] - 42:1
**book** [4] - 2:20, 2:24, 2:25, 3:9
**born** [2] - 29:25,

30:11
**bottom** [1] - 20:8
**Brad** [1] - 2:6
**BRADLEY** [1] - 1:14
**Brennan** [1] - 2:13
**Brennan-Linnan** [1] - 2:13
**brief** [5] - 32:20, 32:22, 33:7, 33:9, 36:25
**briefs** [1] - 36:1
**brink** [1] - 43:24
**broad** [1] - 37:14
**brought** [2] - 6:11, 24:25
**brown** [1] - 30:12
**Brown** [2] - 1:16, 2:7
**BROWN** [1] - 1:16
**BRUCE** [1] - 1:14
**bullet** [1] - 37:16
**bunch** [6] - 3:5, 7:3, 8:6, 14:23, 29:9, 42:4
**Bureau** [1] - 13:15
**business** [2] - 12:20, 12:22
**BY** [3] - 1:14, 1:16, 1:20

## C

**cadence** [1] - 15:8
**calendar** [1] - 2:17
**cancer** [1] - 9:15
**capabilities** [1] - 11:9
**capacity** [1] - 25:9
**capricious** [2] - 41:23, 41:25
**captured** [1] - 33:8
**care** [2] - 8:4, 34:6
**careful** [2] - 23:14, 23:22
**Carolina** [1] - 1:15
**Carta** [3] - 27:25, 28:3, 28:4
**case** [13] - 7:13, 17:2, 20:17, 20:24, 24:6, 24:21, 25:2, 41:13, 45:9, 45:10, 45:13
**CASE** [1] - 1:5
**case-by-case** [2] - 7:13, 17:2
**cases** [5] - 36:6, 36:9, 36:11, 36:14, 40:13
**catchall** [2] - 34:12, 35:7
**categorized** [2] - 7:15, 7:17

**caveat** [3] - 30:22, 43:21, 43:22
**caveats** [2] - 43:8, 43:9
**CC** [1] - 32:21
**Center** [3] - 5:25, 6:20, 6:22
**centered** [1] - 5:14
**century** [1] - 28:4
**certain** [2] - 4:16, 21:23
**certainly** [2] - 3:13, 35:6
**CERTIFICATE** [1] - 46:13
**Certified** [1] - 1:23
**certify** [1] - 46:15
**cetera** [1] - 3:20
**chambers** [1] - 46:5
**change** [2] - 33:1
**changed** [2] - 18:3, 26:16
**changing** [1] - 31:23
**Chapter** [1] - 27:24
**charge** [3] - 7:15, 8:12, 8:15
**charged** [1] - 7:9
**charges** [2] - 6:10, 24:24
**Charleston** [1] - 1:15
**cheap** [1] - 36:2
**check** [1] - 29:5
**chief** [7] - 2:13, 21:20, 21:21, 22:2, 22:12, 23:17, 23:20
**choice** [1] - 33:25
**circuit** [1] - 36:22
**citation** [1] - 24:18
**cite** [2] - 26:2, 32:24
**cited** [1] - 32:16
**Citizenship** [1] - 44:14
**Civil** [2] - 1:19, 2:2
**clarify** [4] - 17:6, 17:7, 25:25, 40:15
**class** [1] - 38:6
**classes** [5] - 40:10, 40:12, 40:16, 44:4, 44:5
**clause** [2] - 27:20, 27:21
**clear** [3] - 4:2, 44:24, 45:14
**clearly** [1] - 25:1
**clerk** [2] - 22:3, 41:13
**CLERK** [1] - 2:2
**clerks** [1] - 27:22
**clicking** [1] - 33:7

**client** [4] - 42:19, 45:15, 45:17, 45:19
**client's** [1] - 43:17
**close** [2] - 12:20, 12:22
**co** [1] - 44:20
**co-counsel** [1] - 44:20
**colleges** [2] - 35:21
**colloquy** [1] - 38:25
**Columbia** [1] - 46:15
**COLUMBIA** [1] - 1:1
**coming** [1] - 41:12
**commend** [1] - 3:8
**committed** [1] - 6:23
**communicated** [1] - 22:9
**communities** [1] - 35:20
**complaint** [1] - 25:3
**completed** [2] - 15:3, 31:19
**compliance** [1] - 28:25
**comply** [1] - 37:18
**conceding** [1] - 45:19
**concern** [1] - 35:18
**concerned** [2] - 35:17, 35:22
**concerns** [1] - 45:16
**concluded** [1] - 46:12
**conducted** [3] - 13:5, 14:16, 38:16
**Conference** [1] - 46:17
**confident** [1] - 44:17
**confirmed** [1] - 38:3
**conformance** [1] - 46:16
**consideration** [5] - 23:14, 23:22, 27:4, 27:5, 28:17
**consolidated** [1] - 12:19
**Constitution** [1] - 1:24
**constitutional** [1] - 2:23
**Consular** [2] - 13:16, 13:17
**contact** [1] - 32:10
**contains** [1] - 22:22
**continued** [1] - 12:7
**continues** [1] - 37:14
**contract** [1] - 9:20
**contractor** [1] - 34:9
**contrary** [1] - 45:22

**contributed** [1] - 35:20
**control** [2] - 31:10, 31:12
**converted** [1] - 38:13
**convicted** [1] - 6:7
**copy** [1] - 19:8
**correct** [6] - 11:7, 13:1, 14:1, 21:19, 40:7, 40:8
**Correct** [1] - 18:2
**cost** [1] - 9:13
**cost-cutting** [1] - 9:13
**counsel** [4] - 2:10, 17:17, 41:2, 44:20
**counselor** [2] - 32:4, 40:3
**counterthreat** [2] - 18:17, 18:23
**countries** [1] - 28:15
**country** [14] - 17:25, 18:3, 25:6, 26:3, 26:9, 26:15, 27:10, 27:15, 28:12, 32:8, 35:19, 39:16, 39:17, 45:20
**COURT** [198] - 1:1, 2:15, 3:14, 4:1, 4:8, 4:10, 4:19, 4:21, 4:24, 5:1, 5:4, 5:8, 5:10, 5:12, 5:16, 5:18, 5:23, 6:1, 6:3, 6:6, 6:9, 6:13, 6:16, 6:19, 6:21, 6:25, 7:2, 7:6, 7:19, 7:23, 8:1, 8:4, 8:15, 8:19, 8:21, 8:25, 9:2, 9:6, 9:9, 9:12, 9:21, 9:25, 10:8, 10:14, 10:18, 10:23, 11:4, 11:10, 11:12, 11:15, 11:21, 11:24, 12:1, 12:10, 12:13, 12:16, 12:18, 12:22, 12:25, 13:2, 13:4, 13:6, 13:8, 13:11, 13:13, 13:17, 13:19, 13:25, 14:2, 14:5, 14:8, 14:10, 14:13, 14:17, 14:19, 14:23, 15:5, 15:10, 15:13, 15:18, 15:20, 15:22, 16:2, 16:5, 16:7, 16:10, 16:14, 16:24, 17:3, 17:11, 17:13, 17:17, 17:22, 17:24, 18:4, 18:7, 18:10, 18:14, 18:20, 19:1, 19:5, 19:8, 19:11, 19:15, 19:17, 19:20, 19:22, 20:1, 20:4, 20:8, 20:11,

20:15, 20:18, 20:22, 21:1, 21:7, 21:13, 21:17, 21:20, 22:1, 22:7, 22:11, 22:13, 22:17, 22:20, 22:25, 23:9, 23:13, 23:18, 23:25, 24:6, 24:10, 24:15, 24:18, 25:5, 25:11, 26:2, 26:8, 26:12, 26:20, 26:24, 27:8, 27:10, 27:13, 27:17, 27:19, 29:2, 29:14, 29:18, 29:24, 30:2, 30:7, 30:9, 30:13, 30:20, 31:1, 31:5, 31:16, 31:22, 32:3, 32:12, 32:18, 33:5, 33:15, 33:21, 33:24, 34:3, 34:16, 34:20, 34:25, 36:9, 36:13, 36:16, 37:5, 37:9, 38:19, 39:5, 39:14, 39:24, 40:9, 40:17, 40:22, 41:8, 41:24, 42:12, 42:21, 43:14, 44:4, 44:7, 44:9, 44:15, 44:24, 45:3, 45:7, 45:15, 46:2, 46:11, 46:21
**court** [9] - 2:12, 2:14, 26:16, 36:1, 36:16, 43:12, 43:13, 44:19
**Court** [6] - 1:24, 2:1, 41:13, 42:18, 46:14, 46:14
**courts** [1] - 28:6
**Crime** [3] - 5:25, 6:20, 6:21
**crime** [1] - 6:23
**criminal** [12] - 3:19, 3:21, 4:4, 4:18, 4:21, 5:13, 10:20, 24:17, 24:21, 25:12, 25:13, 33:23
**criminality** [1] - 5:21
**criticism** [1] - 34:4
**criticizing** [1] - 36:5
**CRR** [1] - 46:20
**current** [3] - 39:3, 43:2, 43:4
**Customs** [1] - 1:7
**cut** [1] - 28:16
**cutting** [1] - 9:13

## D

**dad** [2] - 30:4, 30:7
**data** [2] - 10:5, 21:2
**database** [13] - 6:1, 6:22, 7:7, 7:8, 9:7,

9:10, 9:18, 10:2,
10:10, 10:16, 11:6,
42:4
**date** [1] - 31:2
**dated** [1] - 37:9
**Dated** [1] - 46:18
**days** [4] - 15:23,
38:12, 40:23, 41:20
**DC** [4] - 1:12, 1:21,
1:25, 5:10
**deal** [1] - 31:10
**declaration** [1] - 4:13
**deemed** [1] - 20:20
**defendant** [1] - 2:9
**Defendant** [1] - 1:8
**DEFENDANT** [1] -
1:19
**defense** [1] - 24:21
**defer** [1] - 16:23
**definitely** [1] - 42:10
**degree** [1] - 44:7
**degrees** [1] - 28:16
**delegates** [1] - 13:12
**delta** [1] - 21:2
**Department** [16] -
1:19, 3:18, 4:14, 4:15,
7:18, 12:21, 13:14,
13:21, 15:11, 17:8,
17:9, 17:14, 18:24,
19:21, 38:25, 39:21
**deported** [1] - 25:6
**DEPUTY** [1] - 2:2
**deputy** [1] - 19:18
**describe** [3] - 34:1,
34:2, 41:6
**described** [4] - 3:23,
3:25, 4:12, 38:7
**descriptive** [1] -
34:23
**designated** [2] -
32:9, 40:14
**detail** [1] - 45:24
**detention** [2] - 30:21,
31:4
**determination** [2] -
24:1, 24:5
**determine** [3] - 5:21,
10:6, 28:25
**development** [2] -
18:18, 18:23
**DHS** [11] - 4:19, 5:14,
8:25, 18:11, 19:2,
20:6, 20:12, 21:8,
21:14, 21:16
**different** [2] - 12:11,
40:22
**Diplomate** [1] - 1:23
**diplomats** [1] - 13:17
**directed** [1] - 35:4
**director** [3] - 2:11,

3:17, 8:18
**Director** [1] - 1:6
**disagree** [1] - 26:25
**disagreement** [1] -
40:24
**disclosed** [1] - 25:15
**discretion** [3] -
37:14, 37:15, 38:24
**discussed** [1] -
39:10
**discussion** [2] -
17:6, 28:18
**discussions** [1] -
27:23
**dismissed** [1] - 25:2
**disposition** [1] - 7:16
**DISTRICT** [3] - 1:1,
1:1, 1:10
**District** [2] - 46:14
**district** [2] - 2:12,
2:14
**division** [7] - 10:5,
21:20, 21:21, 22:2,
22:12, 23:17, 23:19
**Division** [7] - 1:19,
6:18, 18:17, 18:22,
22:15, 22:16, 23:19
**docket** [1] - 44:19
**document** [4] - 28:8,
32:12, 32:13, 37:13
**done** [3] - 7:12, 24:1,
33:3
**down** [8] - 11:17,
11:20, 11:21, 12:16,
20:4, 30:4, 33:19,
33:21
**driver's** [1] - 25:8
**driving** [3] - 6:10,
24:19, 24:24
**drop** [2] - 33:19,
33:21
**drop-down** [2] -
33:19, 33:21
**due** [6] - 27:20,
27:21, 28:2, 28:6,
35:6
**duration** [2] - 21:10,
33:10
**during** [1] - 8:8

**E**

**ECF** [1] - 37:2
**education** [1] - 43:25
**effect** [4] - 26:13,
32:14, 32:17, 37:24
**effective** [2] - 37:22,
41:2
**effort** [11] - 5:20,
8:10, 8:12, 8:14, 8:15,

8:16, 10:4, 10:9,
10:22, 31:10, 31:12
**either** [3] - 26:15,
32:1, 35:10
**eliminate** [1] - 39:22
**email** [12] - 3:16, 4:2,
4:3, 19:11, 20:5,
20:12, 20:16, 20:18,
20:22, 20:23, 23:12,
46:5
**embodied** [1] - 28:8
**employee** [2] -
22:15, 34:9
**employees** [8] -
7:22, 8:6, 9:17, 10:9,
10:24, 11:1, 11:16,
21:24
**end** [2] - 29:9, 36:6
**endeavor** [1] - 44:22
**endeavored** [1] -
7:13
**enforce** [2] - 28:7,
30:25
**enforcement** [1] -
30:24
**Enforcement** [1] -
1:7
**engineering** [2] -
28:16, 44:7
**England** [1] - 3:3
**enjoin** [1] - 44:25
**enter** [1] - 44:19
**entered** [2] - 30:15,
44:5
**entering** [1] - 18:3
**entire** [3] - 24:1,
44:16, 44:25
**entitled** [1] - 46:16
**error** [1] - 31:7
**estimate** [2] - 9:23,
15:7
**et** [1] - 3:20
**Everly** [1] - 2:11
**exact** [2] - 4:6, 11:11
**exactly** [4] - 7:23,
8:1, 13:23, 43:16
**example** [2] - 7:2,
35:13
**Exchange** [3] -
18:18, 18:24, 37:7
**executive** [1] - 8:18
**Exhibit** [2] - 22:10,
37:3
**exist** [1] - 11:9
**expired** [8] - 16:6,
16:7, 16:11, 16:18,
17:20, 17:24, 23:5,
38:15
**expires** [1] - 46:7
**explain** [1] - 37:9

**explains** [1] - 45:24

**F**

**F-1** [2] - 11:2, 38:14
**fact** [5] - 10:6, 24:25,
25:14, 40:15, 41:11
**failure** [4] - 33:22,
34:19, 34:22, 37:18
**fair** [3] - 7:12, 40:19,
40:23
**false** [2] - 31:19,
31:21
**family** [1] - 38:9
**far** [3] - 40:5, 42:21,
45:8
**Federal** [1] - 46:14
**federal** [9] - 1:24,
7:22, 8:6, 9:14, 9:17,
10:24, 11:1, 11:16,
42:2
**FEDERAL** [1] - 46:21
**fell** [1] - 37:8
**few** [1] - 25:7
**field** [6] - 32:10,
34:14, 40:14, 40:18,
40:20, 44:13
**Fifth** [2] - 27:20,
27:22
**file** [1] - 35:25, 46:4
**filed** [3] - 3:11, 25:3,
36:25
**fillable** [1] - 34:14
**final** [1] - 43:25
**fine** [2] - 15:15,
40:25
**Fine** [1] - 25:18
**finishing** [1] - 43:24
**firing** [1] - 42:2
**First** [1] - 2:16
**first** [12] - 2:24, 3:15,
5:1, 5:12, 11:5, 15:5,
19:11, 21:3, 23:10,
28:1, 30:13
**firsthand** [1] - 34:11
**five** [1] - 31:6
**flag** [4] - 28:24,
31:25, 40:6
**focus** [1] - 8:9
**follow** [3] - 32:2,
32:11, 40:13
**follow-up** [1] - 40:13
**following** [1] - 25:3
**FOR** [4] - 1:1, 1:9,
1:13, 1:19
**foregoing** [1] - 46:15
**foreign** [1] - 20:19
**format** [1] - 46:16
**forthright** [2] - 25:17,
29:12, 35:2

**forward** [1] - 2:4
**founding** [1] - 2:22
**four** [3] - 10:12,
10:14, 31:6
**France** [1] - 2:25
**Franklin** [1] - 3:1
**French** [1] - 3:2
**front** [1] - 19:10
**funding** [1] - 9:15
**furtherance** [1] -
3:19

**G**

**gazillion** [1] - 36:21
**Georgia** [2] - 30:4,
30:5
**given** [4] - 5:19,
8:21, 11:4, 41:20
**government** [21] -
9:15, 10:8, 25:16,
25:18, 25:22, 28:9,
31:7, 31:18, 32:1,
36:17, 36:20, 40:23,
41:13, 41:17, 41:19,
42:13, 43:1, 45:5,
45:18, 45:19
**government's** [2] -
31:22, 43:5
**grace** [2] - 34:16,
35:9
**graduating** [1] - 44:1
**Great** [1] - 5:4
**great** [2] - 2:15
**group** [4] - 18:17,
34:5, 36:11, 36:14
**groups** [1] - 23:4
**guess** [6] - 34:10,
34:12, 39:14, 40:1,
41:18
**guidance** [2] - 37:12,
37:16
**guys** [3] - 44:18,
46:2, 46:4

**H**

**H-1** [1] - 38:9
**H-2** [1] - 38:11
**H-4** [1] - 38:8
**half** [1] - 14:8
**Hammer** [2] - 8:18,
22:8
**hammer** [4] - 8:19,
22:8, 23:13, 23:16
**hampering** [1] -
30:25
**handful** [1] - 36:11
**handle** [1] - 11:5
**hanging** [1] - 3:1

**happy** [5] - 30:9, 36:24, 44:21, 45:4, 45:20
**hard** [2] - 44:25, 45:1
**hated** [1] - 3:2
**head** [2] - 8:16, 11:25
**headquarters** [1] - 5:15
**heads** [1] - 16:18
**heads-up** [1] - 16:18
**hear** [2] - 3:7, 27:4
**HEARING** [1] - 1:9
**hearing** [5] - 29:10, 29:11, 31:11, 38:7, 41:7
**help** [1] - 19:6
**helpful** [2] - 29:12, 40:1
**hereby** [1] - 46:15
**highlight** [1] - 37:20
**highly** [2] - 2:21, 2:23
**HILLARY** [1] - 1:20
**history** [1] - 24:17
**hit** [10] - 11:17, 29:5, 31:15, 33:23, 34:1, 34:15, 38:19, 38:20, 38:24, 40:12
**hits** [8] - 4:14, 5:21, 7:14, 7:15, 9:18, 10:2, 13:20, 31:21
**hold** [2] - 9:21, 11:21
**Homeland** [4] - 2:11, 3:18, 21:13, 23:19
**homes** [1] - 28:15
**honcho** [1] - 8:16
**Honor** [34] - 2:6, 2:8, 17:5, 17:20, 17:23, 18:2, 18:6, 22:5, 25:10, 25:25, 26:4, 28:23, 29:13, 29:16, 30:16, 31:11, 33:22, 34:10, 36:12, 36:24, 38:4, 41:5, 41:22, 42:10, 42:16, 43:9, 43:24, 44:3, 44:6, 44:8, 44:21, 45:4, 45:14, 46:10
**Honor's** [1] - 41:6
**HONORABLE** [1] - 1:10
**hour** [1] - 24:21
**hours** [5] - 20:15, 21:2, 22:25, 27:5, 28:17
**Houston** [1] - 1:17
**human** [1] - 35:19
**humor** [1] - 9:25
**hundreds** [1] - 36:9

**I**

**ICE** [18] - 2:13, 2:14, 3:18, 4:13, 4:15, 8:24, 9:2, 30:18, 30:23, 31:3, 32:10, 34:14, 37:1, 39:11, 40:14, 40:18, 40:20, 43:11
**ICE's** [2] - 37:13, 38:23
**ideal** [1] - 42:1
**identified** [3] - 7:14, 31:7, 31:19
**identify** [1] - 2:4
**identity** [1] - 31:13
**II** [1] - 2:21
**III** [1] - 1:20
**illegal** [1] - 39:9
**images** [2] - 32:22, 33:8
**imagination** [1] - 42:1
**imagine** [1] - 36:17, 36:18
**immediate** [4] - 30:21, 31:4, 37:24, 44:2
**immediately** [6] - 26:9, 26:15, 35:10, 35:11, 37:23, 40:7
**Immigration** [2] - 1:6, 44:14
**important** [3] - 2:17, 8:25, 28:6
**impressed** [1] - 35:1
**INA** [1] - 38:1
**inappropriate** [2] - 7:2, 7:6
**includes** [4] - 6:3, 6:6, 6:9, 6:13
**indicate** [2] - 32:25, 33:1
**indicative** [1] - 33:14
**individual** [4] - 25:6, 31:13, 31:14, 40:12
**individual's** [1] - 40:21
**individualized** [5] - 24:1, 24:4, 24:11, 24:13, 25:21
**individuals** [7] - 16:15, 21:3, 21:9, 24:2, 35:19, 36:3, 38:6
**information** [15] - 4:15, 30:17, 30:23, 32:17, 34:11, 34:15, 36:2, 39:1, 39:11, 40:21, 41:12, 42:8, 42:13, 43:11, 44:8

**Information** [3] - 5:25, 6:20, 6:22
**initiative** [10] - 3:19, 3:21, 4:5, 4:9, 4:22, 4:25, 5:13, 5:14, 10:19, 10:20
**INJUNCTION** [1] - 1:9
**injunction** [3] - 37:4, 39:5, 39:12
**instance** [1] - 11:8
**instead** [3] - 36:4, 36:6, 36:21
**instruction** [2] - 8:23, 23:11
**instructions** [2] - 18:16, 18:18
**intended** [1] - 31:25
**interacting** [1] - 13:9
**interest** [1] - 21:25
**interested** [2] - 2:22, 40:2
**interests** [1] - 44:1
**Investigations** [2] - 21:14, 23:19
**investigative** [1] - 31:25
**invited** [1] - 35:19
**involved** [1] - 30:12
**ironic** [1] - 44:9
**issue** [7] - 27:14, 37:20, 41:3, 45:8, 45:9, 45:12, 46:4
**issued** [2] - 37:1, 37:11
**issues** [1] - 45:24
**issuing** [1] - 45:21
**item** [1] - 33:21
**items** [1] - 33:19

**J**

**Jane** [2] - 11:5, 11:7
**jobs** [2] - 8:8, 10:1
**John** [5] - 12:10, 12:11, 13:10, 31:16, 31:17
**JOHNNY** [1] - 1:20
**Johnny** [2] - 2:8, 30:10
**joined** [1] - 2:10
**JUDGE** [1] - 1:10
**judges** [1] - 36:21
**JUDGMENT** [1] - 1:10
**Judicial** [1] - 46:17
**Justice** [1] - 1:19

**K**

**keep** [4] - 25:17, 27:1, 41:11, 45:20
**Kentuckian** [1] - 30:10
**Kentucky** [3] - 29:21, 29:23, 30:11
**killed** [1] - 43:20
**kind** [2] - 18:11, 41:16
**King** [1] - 2:25
**knowledge** [4] - 24:10, 27:16, 27:17, 40:24
**knows** [3] - 27:21, 31:3, 40:18
**KY** [1] - 30:3

**L**

**lack** [2] - 33:14, 35:18
**lag** [1] - 15:5
**land** [1] - 28:1
**language** [5] - 42:25, 44:18, 45:5, 45:17, 46:2
**lark** [1] - 28:11
**last** [10] - 3:11, 5:8, 8:21, 10:8, 10:19, 29:10, 36:25, 38:12, 43:25, 45:6
**Law** [1] - 1:13
**law** [7] - 5:5, 26:2, 26:14, 26:15, 28:1, 30:24, 30:25
**lawfully** [6] - 26:5, 26:10, 26:19, 30:14, 30:18, 32:8
**lawyers** [3] - 35:15, 35:23
**lead** [2] - 18:17, 18:23
**leadership** [2] - 8:23, 8:25
**least** [2] - 15:8, 25:16
**leave** [7] - 23:21, 26:3, 26:9, 26:15, 30:3, 35:10, 40:6
**left** [1] - 25:7
**legal** [1] - 2:12
**legally** [6] - 8:7, 18:2, 26:16, 27:14, 28:12, 39:7
**less** [8] - 12:1, 12:2, 14:8, 20:15, 21:1, 22:25, 27:4, 28:16
**letter** [2] - 29:3, 35:13

**letterhead** [1] - 3:20
**level** [2] - 21:23, 34:9
**licenses** [1] - 25:8
**line** [1] - 10:20
**lines** [1] - 10:4
**links** [1] - 32:21
**Linnan** [1] - 2:13
**liquors** [1] - 30:12
**list** [13] - 11:2, 15:13, 15:23, 15:24, 16:16, 18:14, 18:23, 19:22, 22:21, 22:22, 23:1, 33:19
**listening** [1] - 18:20
**lists** [1] - 21:3
**literally** [1] - 28:7
**literate** [1] - 45:23
**litigation** [3] - 2:12, 2:14, 35:25
**lived** [1] - 30:2
**LLC** [1] - 1:13
**look** [6] - 20:4, 32:18, 37:21, 41:10, 42:21, 44:16
**looked** [2] - 24:6, 24:25
**looking** [4] - 25:12, 33:5, 38:4, 45:10
**loss** [1] - 41:16
**lost** [1] - 3:3
**loud** [1] - 45:14
**Louisville** [4] - 29:25, 30:1, 30:2, 30:5
**lower** [1] - 34:9
**lower-level** [1] - 34:9
**LYONS** [1] - 1:6
**Lyons** [1] - 2:3

**M**

**ma'am** [48] - 4:20, 4:23, 5:3, 5:9, 5:17, 6:2, 6:5, 6:8, 6:12, 6:15, 6:24, 7:1, 7:25, 8:20, 9:1, 9:8, 11:14, 11:23, 12:12, 13:3, 13:7, 14:4, 14:9, 15:21, 16:1, 16:4, 16:9, 16:13, 17:12, 19:4, 19:7, 19:14, 19:16, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 23:8, 23:16, 23:24, 24:9, 27:7, 27:9, 27:12, 36:15
**Macklin** [1] - 2:11
**Magna** [3] - 27:25, 28:3, 28:4

**magnitude** [3] - 7:21, 10:22, 15:19
**maintain** [3] - 33:22, 34:19, 34:22
**major** [1] - 44:12
**Maker's** [1] - 29:22
**Mamma** [1] - 30:6
**Marie** [1] - 3:1
**Mark** [1] - 29:22
**match** [1] - 12:8
**matched** [1] - 31:14
**matches** [1] - 31:19
**math** [1] - 12:5
**matter** [1] - 46:16
**mean** [9] - 6:22, 8:4, 12:23, 14:17, 24:6, 32:12, 39:25, 41:14, 42:7
**means** [3] - 14:13, 32:6
**meant** [1] - 24:24
**meeting** [1] - 25:4
**member** [1] - 38:9
**merits** [1] - 26:24
**met** [1] - 5:8
**Meyers** [3] - 3:17, 19:15, 20:16
**middle** [1] - 37:21
**might** [2] - 12:10, 43:20
**miles** [1] - 24:20
**military** [1] - 30:7
**million** [7] - 9:11, 9:19, 10:23, 11:13, 11:15, 11:22, 14:3
**mind** [1] - 42:2
**minutes** [3] - 23:14, 23:22, 27:3
**misdemeanor** [2] - 24:19, 24:20
**missing** [3] - 6:13, 6:14, 7:11
**mistake** [1] - 14:2
**mistakes** [1] - 35:7
**monarchy** [2] - 3:6, 3:8
**money** [1] - 9:14
**months** [1] - 28:15
**moot** [2] - 41:14, 41:15
**morning** [2] - 2:6, 2:8
**most** [2] - 28:8, 34:23
**mostly** [1] - 33:7
**motion** [1] - 37:3
**MOTION** [1] - 1:9
**motions** [1] - 36:22
**Mount** [1] - 30:1

**move** [1] - 25:19
**moved** [1] - 30:5
**MR** [197] - 2:6, 2:8, 3:13, 3:22, 4:6, 4:9, 4:11, 4:20, 4:23, 4:25, 5:3, 5:7, 5:9, 5:11, 5:14, 5:17, 5:19, 5:25, 6:2, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:24, 7:1, 7:5, 7:12, 7:21, 7:25, 8:2, 8:14, 8:17, 8:20, 8:23, 9:1, 9:3, 9:8, 9:11, 9:20, 9:23, 10:4, 10:12, 10:17, 10:21, 11:3, 11:8, 11:11, 11:14, 11:19, 11:23, 11:25, 12:7, 12:12, 12:15, 12:17, 12:19, 12:24, 13:1, 13:3, 13:5, 13:7, 13:10, 13:12, 13:15, 13:18, 13:23, 14:1, 14:4, 14:9, 14:11, 14:15, 14:18, 14:21, 15:3, 15:7, 15:12, 15:17, 15:19, 15:21, 16:1, 16:4, 16:6, 16:9, 16:13, 16:23, 17:2, 17:5, 17:12, 17:16, 17:20, 17:23, 18:2, 18:6, 18:9, 18:13, 18:16, 18:22, 19:4, 19:7, 19:10, 19:14, 19:16, 19:18, 19:21, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 20:25, 21:6, 21:12, 21:16, 21:19, 21:23, 22:5, 22:10, 22:12, 22:15, 22:19, 22:24, 23:8, 23:11, 23:16, 23:24, 24:4, 24:9, 24:13, 24:16, 25:3, 25:9, 25:25, 26:4, 26:10, 26:18, 26:21, 27:7, 27:9, 27:12, 27:16, 27:18, 28:23, 29:13, 29:16, 29:23, 29:25, 30:4, 30:8, 30:12, 30:16, 30:22, 31:3, 31:9, 31:18, 31:24, 32:9, 32:15, 32:20, 33:6, 33:19, 33:22, 33:25, 34:7, 34:18, 34:23, 36:8, 36:11, 36:14, 36:24, 37:7, 37:11, 38:22, 39:10, 39:19, 40:8, 40:11, 40:19, 41:4, 41:22, 42:10, 42:16, 43:8, 43:23,

44:3, 44:6, 44:8, 44:10, 44:21, 45:2, 45:4, 45:14, 46:1, 46:10
**MS** [1] - 14:7
**must** [2] - 32:13, 35:9

## N

**name** [14] - 2:15, 5:6, 5:19, 8:21, 9:6, 9:18, 11:5, 11:6, 22:4, 23:20, 29:16, 29:22
**names** [19] - 7:3, 7:7, 10:2, 11:5, 13:22, 14:3, 14:10, 14:11, 14:23, 14:24, 15:2, 15:3, 15:13, 19:23, 22:20, 24:2, 42:4
**National** [7] - 5:25, 6:21, 18:17, 18:22, 21:14, 22:16, 23:18
**national** [4] - 6:17, 6:18, 6:20
**nationwide** [1] - 36:7
**NCIC** [19] - 4:14, 5:20, 5:22, 5:23, 6:19, 7:3, 9:5, 10:10, 10:16, 11:6, 11:17, 12:8, 31:14, 31:20, 34:15, 38:20, 38:24, 43:4
**necessarily** [7] - 33:1, 33:3, 33:4, 33:13, 34:1, 41:14, 41:15
**need** [5] - 16:10, 31:16, 42:21, 42:23, 46:3
**negative** [1] - 33:3, 33:4
**Neumann** [1] - 1:16
**never** [2] - 7:9, 43:22
**new** [6] - 37:1, 42:8, 42:11, 42:13, 42:17, 43:6
**next** [4] - 12:6, 12:18, 35:7, 43:25
**night** [2] - 3:12, 37:1
**nilly** [1] - 35:5
**NO** [1] - 1:5
**nobody** [1] - 27:21
**non** [1] - 27:1
**non-process** [1] - 27:1
**nonimmigrant** [3] - 9:3, 37:19, 37:22
**nonimmigrant's** [1] - 37:23, 38:2
**normally** [1] - 10:3

**note** [3] - 28:23, 37:16, 44:20
**noted** [2] - 32:24, 39:2
**notes** [2] - 33:2, 39:19
**nothing** [1] - 46:8
**notice** [9] - 16:19, 17:1, 17:4, 17:18, 18:11, 28:17, 41:20, 42:3, 42:15
**nowhere** [2] - 23:25, 45:6
**number** [11] - 3:10, 4:13, 7:7, 10:9, 11:11, 11:20, 12:4, 13:25, 18:4, 27:13, 45:22
**Number** [1] - 31:7
**NW** [2] - 1:20, 1:24

## O

**obligations** [1] - 26:20
**obtained** [1] - 34:11
**obviously** [3] - 25:18, 30:24, 41:1
**occur** [1] - 18:12
**occurred** [1] - 15:8
**OF** [2] - 1:1, 1:9
**office** [5] - 8:17, 10:11, 40:14, 40:18, 40:20
**Office** [1] - 2:9
**offices** [1] - 32:11
**OFFICIAL** [1] - 46:21
**official** [2] - 13:15, 32:10, 40:14
**Official** [1] - 1:24, 46:14
**officials** [2] - 32:10, 40:23
**often** [1] - 10:14
**ON** [1] - 1:9
**once** [1] - 9:21
**one** [18] - 2:18, 11:1, 11:22, 12:7, 12:24, 14:24, 17:6, 18:13, 19:24, 24:6, 24:10, 26:4, 34:2, 37:5, 37:20, 42:16, 43:23, 45:1
**online** [2] - 22:1, 22:6
**opportunity** [1] - 16:20
**opposition** [1] - 37:3
**oppression** [1] - 28:9
**option** [3] - 34:13,

34:24
**optional** [1] - 44:11
**OR** [1] - 1:10
**order** [4] - 7:21, 15:19, 43:12, 43:13
**Order** [1] - 2:1
**original** [1] - 46:15
**outside** [2] - 30:1, 38:23
**overstays** [1] - 10:6
**own** [1] - 13:5

## P

**P.C** [1] - 1:16
**p.m** [6] - 3:16, 19:13, 20:2, 20:5, 20:12, 22:18
**packaging** [1] - 30:8
**page** [3] - 20:8, 33:8, 46:16
**paid** [3] - 28:12, 35:21, 35:23
**papers** [1] - 32:18
**Pappa** [1] - 30:6
**paragraph** [1] - 37:21
**part** [2] - 10:4, 19:23
**particular** [4] - 20:23, 33:11, 33:25, 44:18
**particularly** [2] - 35:17, 35:22
**parties** [1] - 2:4
**passed** [3] - 4:14, 4:15, 18:23
**PATEL** [1] - 1:3
**Patel** [35] - 2:3, 17:18, 20:23, 22:23, 24:11, 24:18, 25:14, 25:14, 25:21, 25:25, 26:5, 27:3, 30:18, 33:21, 34:19, 35:13, 35:14, 36:25, 37:17, 37:19, 38:5, 38:8, 39:2, 39:6, 39:12, 41:11, 41:17, 41:20, 42:7, 43:2, 43:16, 43:24, 44:19, 45:20, 46:8
**Patel's** [4] - 24:6, 32:4, 40:3, 43:4
**pay** [1] - 35:25
**paying** [2] - 28:12, 45:11
**pending** [2] - 41:12, 42:8
**people** [45] - 4:2, 6:1, 6:3, 6:6, 6:9, 6:13, 6:14, 8:1, 8:2, 9:9,

9:19, 10:1, 10:7, 10:23, 11:13, 11:15, 11:22, 12:3, 12:6, 12:13, 13:21, 15:14, 15:20, 15:24, 16:2, 16:7, 16:10, 19:2, 23:2, 23:6, 23:9, 25:7, 25:18, 27:3, 27:4, 27:5, 28:14, 28:15, 29:2, 29:5, 35:24, 36:14, 45:23

**peoples'** [1] - 28:9
**percent** [5] - 11:24, 12:1, 12:2, 14:7, 14:8
**percentage** [1] - 14:5
**period** [2] - 34:17, 35:9
**perma** [1] - 32:21
**person** [11] - 12:5, 22:8, 22:17, 23:4, 24:14, 40:6, 40:9, 40:15, 40:17, 40:20, 45:1
**personnel** [2] - 37:6, 37:12
**persons** [1] - 7:11
**ph)** [1] - 29:17
**Plaintiff** [1] - 1:4
**plaintiff** [5] - 2:7, 20:23, 30:14, 30:20, 32:16
**PLAINTIFF** [1] - 1:13
**plaintiff's** [2] - 17:17, 41:2
**plaintiffs** [4] - 18:5, 29:19, 33:8, 36:10
**plaintiffs'** [2] - 35:23, 35:25
**plan** [1] - 42:14
**pleasant** [1] - 29:8
**point** [1] - 17:6
**pointed** [1] - 33:11
**points** [1] - 37:16
**policy** [10] - 37:1, 39:3, 41:5, 42:11, 42:17, 42:22, 43:6, 43:10, 44:16, 44:25
**pop** [2] - 7:3, 7:7
**pops** [1] - 40:3
**population** [1] - 9:3
**portion** [1] - 20:25
**position** [2] - 43:5, 43:17
**positive** [3] - 5:21, 7:14, 7:15
**postgraduate** [1] - 44:10
**power** [1] - 42:19
**practical** [2] - 39:25, 44:11

**precarious** [1] - 3:2
**Precisely** [1] - 31:18
**precisely** [1] - 3:22
**preliminary** [2] - 37:3, 39:5
**PRELIMINARY** [1] - 1:9
**prepare** [1] - 36:1
**present** [5] - 25:10, 26:5, 26:10, 26:19, 30:18
**pretty** [2] - 33:24, 34:25
**primarily** [1] - 13:10
**primary** [1] - 41:4
**principal** [1] - 19:18
**prioritize** [2] - 21:4, 23:2
**privacy** [1] - 21:24
**Proceedings** [1] - 46:12
**proceedings** [1] - 39:22
**process** [17] - 3:24, 4:1, 4:4, 24:1, 27:1, 27:20, 27:21, 28:2, 28:6, 28:7, 28:22, 31:19, 34:4, 34:8, 35:6
**Produced** [1] - 1:25
**production** [1] - 15:6
**program** [1] - 8:17
**Program** [3] - 18:19, 18:24, 37:8
**promise** [2] - 29:14, 44:22
**properly** [1] - 18:3
**protects** [1] - 42:19
**provide** [4] - 30:22, 34:7, 43:8, 43:9
**provided** [3] - 18:16, 18:18, 37:16
**provides** [2] - 33:9, 37:12
**pull** [1] - 8:5
**pulled** [2] - 24:23, 33:6
**puppies** [1] - 43:20
**purpose** [2] - 31:22, 43:10
**purposes** [1] - 14:15
**put** [6] - 7:21, 8:8, 10:9, 10:15, 11:6, 34:15
**putting** [1] - 10:2

## Q

**quality** [2] - 31:9, 31:11

**questioning** [1] - 28:11
**questions** [9] - 3:10, 26:4, 28:21, 29:9, 29:20, 31:10, 32:11, 35:3, 41:6
**quick** [1] - 46:5
**quite** [2] - 25:17, 44:17
**quiz** [1] - 27:19
**quote** [2] - 24:23, 42:11
**quote-unquote** [1] - 24:23
**quotes** [1] - 33:6

## R

**radicals** [1] - 28:7
**ran** [2] - 4:13, 9:21
**RDR** [1] - 46:20
**RDR-CRR** [1] - 46:20
**reached** [1] - 16:15
**reacts** [1] - 26:21
**read** [1] - 2:21
**really** [5] - 3:5, 45:9, 45:10
**Realtime** [1] - 1:23
**reason** [9] - 7:4, 7:8, 20:22, 25:15, 25:24, 33:11, 35:17, 35:21, 43:18
**reasons** [2] - 33:4, 33:10
**rebels** [1] - 3:5
**receive** [1] - 17:18
**recent** [1] - 31:8
**reckless** [3] - 6:10, 24:19, 24:23
**recommend** [2] - 2:21, 2:24
**Record** [1] - 1:25
**record** [39] - 2:5, 3:11, 3:23, 3:24, 4:18, 12:8, 12:9, 19:9, 19:12, 24:16, 24:25, 25:1, 25:12, 26:1, 26:7, 26:18, 26:22, 30:19, 31:2, 31:14, 31:20, 31:23, 32:5, 32:25, 33:13, 35:2, 37:13, 37:23, 38:2, 38:5, 38:18, 38:24, 39:4, 40:4, 42:5, 43:4, 44:24, 46:16
**records** [8] - 4:16, 4:17, 5:20, 6:14, 8:6, 37:2, 37:15, 39:2
**red** [4] - 28:24, 31:25, 40:6

**redacted** [3] - 21:22, 21:23, 21:24
**Reddy** [1] - 1:16
**Reeves** [2] - 46:14, 46:20
**REEVES** [2] - 1:22, 46:20
**refer** [1] - 4:12
**referred** [4] - 12:20, 13:23, 13:25, 14:2
**Registered** [1] - 1:23
**regulations** [1] - 46:16
**reinstatement** [1] - 35:10
**released** [1] - 2:19
**relief** [2] - 41:15, 45:1
**remain** [4] - 38:14, 39:8, 39:12, 42:8
**remains** [1] - 26:19
**remedied** [1] - 31:20
**remind** [1] - 28:4
**removability** [1] - 37:25, 39:20
**removal** [4] - 30:21, 31:4, 39:22, 39:23
**Reporter** [2] - 1:23, 1:24, 46:14
**REPORTER** [1] - 46:21
**represent** [3] - 18:4, 18:7, 46:8
**representation** [4] - 41:17, 41:18, 42:12, 43:1
**republicanism** [1] - 3:6
**request** [1] - 21:8
**requesting** [1] - 4:16
**require** [2] - 26:8, 26:23, 39:22
**research** [1] - 9:16
**respect** [7] - 8:9, 28:8, 36:25, 37:1, 40:24, 41:16, 42:7
**responded** [1] - 22:13
**responds** [1] - 21:1
**response** [2] - 14:21, 22:18
**responses** [2] - 7:16, 15:8
**responsible** [1] - 10:5
**retain** [1] - 37:13
**returned** [2] - 38:10, 39:1
**review** [3] - 7:13, 20:19, 38:16

**revocation** [10] - 14:14, 14:16, 21:4, 33:23, 37:20, 37:24, 37:25, 38:17, 39:20, 43:10
**revocations** [1] - 14:12
**revoke** [6] - 15:24, 16:11, 21:9, 38:16, 38:17, 39:2
**revoked** [8] - 14:25, 15:15, 16:21, 17:19, 38:3, 38:6, 39:4, 39:17
**revokes** [2] - 37:22, 39:21
**revoking** [3] - 17:8, 17:9, 23:3
**Revolution** [1] - 2:20
**Revolutionary** [1] - 2:23
**REYES** [1] - 1:10
**richer** [1] - 35:20
**Richmond** [1] - 1:17
**Rick** [1] - 2:19
**rid** [2] - 3:7, 4:3
**rights** [1] - 28:9
**Rines** [1] - 29:17
**Robert** [2] - 8:18, 22:8
**role** [4] - 10:12, 10:14, 13:11, 13:13
**roles** [1] - 8:3
**rolling** [1] - 15:6
**rough** [2] - 7:21, 15:19
**rule** [1] - 36:21
**rules** [1] - 42:18
**ruling** [5] - 45:9, 45:10, 45:12, 45:21, 45:23
**run** [9] - 7:3, 7:6, 9:4, 9:6, 9:9, 11:10, 21:2, 23:1, 42:3
**running** [1] - 13:21
**runs** [2] - 11:8, 11:10
**rushed** [1] - 34:4
**rushing** [1] - 36:4
**Rutledge** [1] - 1:14

## S

**Sam** [2] - 12:4, 14:5
**scan** [1] - 32:22
**school** [12] - 5:5, 26:21, 26:22, 30:1, 32:1, 32:9, 32:10, 40:3, 40:11, 40:14, 43:20
**scope** [2] - 3:22, 4:6

**scrub** [1] - 5:20
**scrutinized** [1] - 24:16
**search** [1] - 8:6
**seated** [1] - 29:14
**second** [7] - 2:20, 2:25, 3:8, 11:22, 21:7, 37:5, 37:21
**secretary** [1] - 19:19
**Section** [1] - 37:25
**section** [2] - 2:13, 2:14
**Security** [10] - 2:11, 3:18, 6:18, 18:17, 18:22, 21:13, 21:15, 22:16, 23:19
**see** [23] - 3:23, 9:18, 10:2, 14:21, 19:11, 19:13, 20:6, 20:9, 20:11, 20:13, 21:5, 21:11, 22:18, 23:11, 23:12, 30:9, 33:15, 33:16, 38:19, 40:12, 42:4, 45:24, 46:5
**seeking** [2] - 3:5, 25:16
**select** [2] - 33:20, 34:24
**send** [6] - 14:10, 15:13, 15:23, 16:5, 19:22, 20:1
**sending** [3] - 16:15, 18:10, 18:11
**sends** [5] - 15:23, 18:14, 20:12, 21:17, 23:21
**senior** [1] - 13:15
**sense** [1] - 42:23
**sensitive** [1] - 30:25
**sent** [12] - 7:17, 13:2, 15:14, 17:1, 17:4, 17:14, 19:15, 20:16, 22:17, 25:1, 29:3, 35:12
**separate** [1] - 39:21
**serve** [3] - 8:2, 23:17, 37:25
**Services** [1] - 44:14
**set** [1] - 14:24
**seven** [1] - 3:3
**seven-year** [1] - 3:3
**SEVIS** [46] - 4:17, 5:20, 7:7, 12:8, 16:3, 16:12, 16:20, 17:15, 18:25, 21:8, 23:7, 23:10, 23:15, 24:3, 26:1, 26:7, 26:14, 26:19, 26:22, 27:6, 29:3, 30:19, 31:8, 31:14, 31:20, 31:23,

32:4, 32:14, 32:17, 32:25, 33:2, 33:3, 33:13, 33:16, 33:17, 34:13, 37:2, 37:13, 37:23, 38:2, 38:18, 39:4, 39:13, 39:25, 40:4
**SEVP** [5] - 37:5, 37:6, 37:12, 37:23, 38:1
**Shane** [2] - 19:15, 19:17
**short** [1] - 36:22
**short-circuit** [1] - 36:22
**significant** [1] - 28:8
**single** [2] - 18:13, 25:6
**situation** [1] - 3:2
**six** [1] - 31:7
**Smith** [10] - 11:6, 11:7, 12:10, 12:11, 31:16, 31:17, 39:15, 43:16, 43:18, 43:20
**Smith's** [1] - 40:4
**snipped** [1] - 32:21
**someone** [15] - 9:17, 20:5, 20:6, 20:12, 21:13, 21:17, 21:20, 22:13, 23:1, 23:18, 23:21, 35:12, 39:16, 40:2
**somewhere** [2] - 10:19, 32:13
**SONJA** [2] - 1:22, 46:20
**Sonja** [2] - 46:14, 46:20
**sorry** [3] - 7:5, 7:25, 22:13
**sort** [9] - 3:24, 19:6, 32:21, 33:6, 34:7, 34:12, 34:14, 36:22, 38:7
**sounds** [1] - 33:24
**sources** [1] - 10:6
**South** [1] - 1:15
**specific** [5] - 5:20, 10:21, 15:4, 37:12, 37:15
**specifically** [2] - 42:7, 44:19
**speed** [1] - 25:18
**speeding** [6] - 7:10, 24:24, 25:7, 25:15, 25:23, 42:5
**spend** [2] - 9:17, 42:3
**spending** [2] - 9:14, 11:12

**spent** [2] - 10:24, 11:16
**spreadsheet** [1] - 20:24
**spreadsheets** [3] - 7:17, 12:19, 15:4
**staff** [5] - 5:19, 7:13, 7:19, 8:13, 8:14
**start** [2] - 7:24, 36:23
**started** [1] - 38:8
**starts** [1] - 2:25
**state** [2] - 13:5, 23:9
**State** [45] - 4:14, 4:15, 7:18, 12:21, 13:2, 13:6, 13:9, 13:14, 13:21, 14:3, 14:10, 14:16, 14:17, 14:19, 14:21, 15:11, 15:15, 15:23, 16:15, 16:23, 17:4, 17:7, 17:8, 17:14, 17:18, 18:10, 18:14, 18:24, 19:1, 19:2, 19:21, 19:22, 20:5, 20:12, 21:14, 21:20, 23:5, 25:22, 27:4, 27:5, 37:22, 38:3, 38:25, 39:21
**State's** [2] - 32:15, 32:24
**STATES** [1] - 1:1
**States** [20] - 2:9, 3:8, 9:4, 17:10, 24:8, 24:12, 25:22, 26:6, 26:11, 26:19, 30:14, 30:18, 30:21, 38:10, 38:11, 38:12, 38:14, 44:14, 46:14, 46:17
**status** [42] - 10:7, 14:15, 15:15, 15:22, 16:17, 17:10, 17:11, 17:13, 17:14, 17:22, 18:1, 18:3, 21:8, 21:10, 25:17, 25:24, 26:1, 27:14, 32:8, 33:1, 33:2, 33:10, 33:12, 33:14, 33:23, 34:19, 34:21, 34:22, 35:14, 35:15, 37:19, 38:13, 39:6, 39:7, 39:16, 39:17, 39:18, 39:22, 40:15, 41:11, 43:4
**stay** [1] - 28:14
**STEM** [1] - 44:12
**stenographic** [1] - 46:15
**Stenographic** [1] - 1:25
**STEVEN** [1] - 1:16

**Steven** [1] - 2:7
**still** [10] - 17:11, 17:13, 28:25, 32:7, 32:8, 39:14, 39:18, 39:24, 41:16, 42:1
**Street** [1] - 1:20
**stretch** [1] - 42:1
**student** [9] - 3:19, 3:21, 4:4, 4:21, 5:12, 10:20, 28:25, 32:3, 38:14
**Student** [3] - 18:18, 18:24, 37:7
**student's** [1] - 31:23
**Students** [1] - 21:7
**students** [17] - 4:13, 8:6, 9:4, 10:10, 10:15, 10:17, 10:18, 10:21, 11:2, 20:19, 27:8, 27:10, 28:11, 29:4, 35:20, 42:4
**studied** [1] - 28:13
**studies** [1] - 38:8
**study** [3] - 32:15, 32:24, 44:13
**studying** [2] - 9:4, 27:10
**subject** [5] - 30:20, 31:4, 42:11, 43:6, 43:9
**submitted** [1] - 20:19
**subordinate** [1] - 22:15
**Suite** [1] - 1:17
**SUMMARY** [1] - 1:10
**super** [1] - 3:3
**support** [2] - 3:4, 9:20
**supported** [1] - 8:14
**supporting** [1] - 3:5
**suppose** [2] - 6:9, 41:12
**Supreme** [1] - 41:13
**survived** [1] - 5:4
**system** [4] - 2:23, 11:18, 26:17, 38:20
**systems** [2] - 21:2, 44:8

**T**

**tab** [3] - 21:3, 21:7, 23:10
**table** [1] - 2:10
**tagged** [2] - 25:7, 25:19
**team** [1] - 24:9
**technically** [1] - 41:10
**tens** [1] - 42:2

**term** [2] - 4:11, 44:2
**Terminate** [2] - 23:6, 23:22
**terminate** [18] - 7:3, 7:8, 16:2, 16:12, 16:16, 17:15, 19:2, 21:8, 23:6, 23:15, 29:2, 35:14, 37:13, 37:15, 37:23, 38:1, 38:24, 42:14
**terminated** [22] - 4:16, 4:17, 16:19, 17:19, 23:10, 24:2, 26:1, 26:7, 27:6, 30:19, 31:23, 32:5, 32:14, 33:17, 33:18, 33:20, 39:25, 40:2, 40:4, 42:14, 43:12, 43:15
**terminating** [1] - 38:18
**termination** [26] - 18:25, 26:2, 26:8, 26:9, 26:13, 26:18, 26:22, 29:6, 31:8, 32:4, 32:17, 32:25, 33:2, 33:3, 33:10, 33:11, 33:12, 33:13, 34:18, 34:20, 34:21, 39:4, 41:3, 42:11, 43:6, 43:10
**terminations** [2] - 28:24, 37:2
**terms** [3] - 25:4, 37:18, 38:15
**Texas** [2] - 1:17, 24:19
**THE** [200] - 1:1, 1:10, 1:13, 1:19, 2:15, 3:14, 4:1, 4:8, 4:10, 4:19, 4:21, 4:24, 5:1, 5:4, 5:8, 5:10, 5:12, 5:16, 5:18, 5:23, 6:1, 6:3, 6:6, 6:9, 6:13, 6:16, 6:19, 6:21, 6:25, 7:2, 7:6, 7:19, 7:23, 8:1, 8:4, 8:15, 8:19, 8:21, 8:25, 9:2, 9:6, 9:9, 9:12, 9:21, 9:25, 10:8, 10:14, 10:18, 10:23, 11:4, 11:10, 11:12, 11:15, 11:21, 11:24, 12:1, 12:10, 12:13, 12:16, 12:18, 12:22, 12:25, 13:2, 13:4, 13:6, 13:8, 13:11, 13:13, 13:17, 13:19, 13:25, 14:2, 14:5, 14:8, 14:10, 14:13, 14:17, 14:19, 14:23,

15:5, 15:10, 15:13, 15:18, 15:20, 15:22, 16:2, 16:5, 16:7, 16:10, 16:14, 16:24, 17:3, 17:11, 17:13, 17:17, 17:22, 17:24, 18:4, 18:7, 18:10, 18:14, 18:20, 19:1, 19:5, 19:8, 19:11, 19:15, 19:17, 19:20, 19:22, 20:1, 20:4, 20:8, 20:11, 20:15, 20:18, 20:22, 21:1, 21:7, 21:13, 21:17, 21:20, 22:1, 22:7, 22:11, 22:13, 22:17, 22:20, 22:25, 23:9, 23:13, 23:18, 23:25, 24:6, 24:10, 24:15, 24:18, 25:5, 25:11, 26:2, 26:8, 26:12, 26:20, 26:24, 27:8, 27:10, 27:13, 27:17, 27:19, 29:2, 29:14, 29:18, 29:24, 30:2, 30:7, 30:9, 30:13, 30:20, 31:1, 31:5, 31:16, 31:22, 32:3, 32:12, 32:18, 33:5, 33:15, 33:21, 33:24, 34:3, 34:16, 34:20, 34:25, 36:9, 36:13, 36:16, 37:5, 37:9, 38:19, 39:5, 39:14, 39:24, 40:9, 40:17, 40:22, 41:8, 41:24, 42:12, 42:21, 43:14, 44:4, 44:7, 44:9, 44:15, 44:24, 45:3, 45:7, 45:15, 46:2, 46:11

**themselves** [1] - 2:5
**thousands** [4] - 27:5, 27:13, 35:24, 42:2
**three** [10] - 9:23, 10:2, 10:24, 11:16, 15:8, 15:10, 16:25, 37:22, 44:13, 45:6
**throughout** [1] - 3:24
**Thursday** [1] - 46:7
**ticket** [3] - 6:10, 25:16, 25:23
**timeline** [1] - 19:5
**today** [6] - 2:16, 2:19, 23:21, 26:5, 27:19, 43:7
**TODD** [1] - 1:6
**Todd** [1] - 2:3
**together** [1] - 8:10
**took** [3] - 8:24, 9:2,

14:17
**top** [2] - 11:25, 29:11
**total** [2] - 17:1, 36:15
**tourist** [3] - 38:11, 38:12, 38:15
**tracking** [1] - 11:16
**training** [1] - 44:11
**transcript** [3] - 46:15, 46:15, 46:16
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:9
**transferred** [1] - 30:4
**travel** [3] - 17:9, 39:21
**traveled** [1] - 38:10
**tried** [1] - 6:4
**trilogy** [2] - 2:20, 2:21
**TRO** [5] - 30:15, 39:5, 39:12, 44:5, 46:7
**troubled** [1] - 35:22
**true** [1] - 46:15
**try** [2] - 28:13, 44:21
**trying** [5] - 28:7, 28:15, 44:25, 45:1, 45:3
**Tuesday** [3] - 1:11, 3:15, 19:12
**turnaround** [1] - 15:1
**two** [9] - 9:23, 10:1, 10:24, 11:16, 25:16, 36:14, 39:20, 41:20, 46:9
**tyrannical** [1] - 28:9

**U**

**U.S** [8] - 1:6, 1:19, 3:4, 3:18, 8:7, 10:16, 28:14, 35:10
**ultra** [3] - 42:17, 42:18
**under** [7] - 9:11, 21:10, 37:25, 38:8, 38:14, 42:11, 43:6
**understood** [1] - 46:1
**undertook** [1] - 34:8
**unhinged** [1] - 28:6
**unit** [1] - 18:23
**United** [20] - 2:9, 3:8, 9:4, 17:9, 24:8, 24:12, 25:22, 26:6, 26:11, 26:19, 30:14, 30:18, 30:21, 38:10, 38:11, 38:12, 38:14, 44:14, 46:14, 46:17
**UNITED** [1] - 1:1

**universities** [2] - 28:13, 29:4
**university** [1] - 32:1
**unquote** [1] - 24:23
**unredacted** [1] - 20:25
**up** [22] - 5:1, 7:3, 7:7, 11:17, 16:18, 20:24, 29:5, 29:15, 29:19, 32:2, 32:11, 36:6, 36:16, 36:17, 40:3, 40:11, 40:13, 42:25, 43:2, 43:15, 44:12, 44:18
**updated** [1] - 40:24
**upset** [1] - 3:3
**utter** [1] - 35:18

**V**

**valid** [10] - 14:12, 14:14, 16:9, 21:3, 21:8, 21:9, 23:2, 23:5, 23:7, 39:16
**validate** [1] - 12:7
**validly** [1] - 17:14
**various** [3] - 8:2, 10:6, 41:22
**versus** [1] - 2:3
**view** [2] - 29:7, 30:13
**violation** [4] - 33:12, 34:16, 34:20, 35:14
**vires** [3] - 42:17, 42:18
**Virginia** [1] - 24:20
**visa** [42] - 14:12, 14:14, 14:16, 14:17, 15:24, 16:17, 16:21, 17:9, 17:18, 17:20, 17:24, 17:25, 21:8, 21:9, 23:2, 23:7, 29:1, 33:23, 37:20, 37:22, 37:24, 38:3, 38:6, 38:8, 38:11, 38:13, 38:15, 38:16, 38:17, 39:1, 39:2, 39:3, 39:4, 39:7, 39:15, 39:16, 39:17, 39:19, 39:21, 43:10
**visas** [13] - 10:10, 10:16, 11:2, 14:24, 15:15, 16:6, 16:8, 16:9, 17:8, 21:3, 21:4, 23:3, 23:5
**visible** [1] - 33:7
**visit** [1] - 30:6
**Visitor** [3] - 18:19, 18:24, 37:7
**vs** [1] - 1:5

**W**

**wade** [1] - 42:22
**walker** [3] - 35:18, 42:24, 42:25
**WALKER** [57] - 1:20, 2:8, 3:13, 3:22, 4:6, 4:9, 4:11, 17:5, 17:12, 17:16, 19:10, 20:25, 21:23, 22:5, 25:25, 26:4, 26:10, 26:18, 26:21, 29:16, 29:23, 29:25, 30:4, 30:8, 30:12, 30:16, 30:22, 31:3, 31:9, 31:18, 31:24, 32:9, 32:15, 32:20, 33:6, 33:19, 33:25, 34:7, 34:18, 34:23, 36:24, 37:7, 37:11, 38:22, 39:10, 39:19, 40:8, 40:11, 40:19, 41:4, 43:8, 43:23, 44:21, 45:2, 45:14, 46:1, 46:10
**Walker** [17] - 2:8, 3:10, 17:3, 21:22, 23:20, 28:18, 30:11, 34:25, 36:20, 43:2, 43:17, 43:18, 44:15, 45:7, 45:11, 46:7
**wants** [1] - 44:20
**War** [2] - 2:21, 2:23
**war** [1] - 3:3
**Washington** [4] - 1:12, 1:21, 1:25, 30:1
**WATSON** [122] - 4:20, 4:23, 4:25, 5:3, 5:7, 5:9, 5:11, 5:14, 5:17, 5:19, 5:25, 6:2, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:24, 7:1, 7:5, 7:12, 7:21, 7:25, 8:2, 8:14, 8:17, 8:20, 8:23, 9:1, 9:3, 9:8, 9:11, 9:20, 9:23, 10:4, 10:12, 10:17, 10:21, 11:3, 11:8, 11:11, 11:14, 11:19, 11:23, 11:25, 12:7, 12:12, 12:15, 12:17, 12:19, 12:24, 13:1, 13:3, 13:5, 13:7, 13:10, 13:12, 13:15, 13:18, 13:23, 14:1, 14:4, 14:9, 14:11, 14:15, 14:18, 14:21, 15:3, 15:7, 15:12, 15:17, 15:19, 15:21, 16:1, 16:4, 16:6, 16:9, 16:13, 16:23, 17:2,

18:16, 18:22, 19:4, 19:7, 19:14, 19:16, 19:18, 19:21, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 21:6, 21:12, 21:16, 21:19, 22:10, 22:12, 22:15, 22:19, 22:24, 23:8, 23:11, 23:16, 23:24, 24:4, 24:9, 24:13, 24:16, 25:3, 25:9, 27:7, 27:9, 27:12, 27:16, 27:18, 28:23, 29:13
**Watson** [17] - 2:10, 3:16, 3:17, 3:25, 4:12, 5:7, 28:20, 29:8, 31:12, 31:24, 34:5, 36:5, 36:18, 38:5, 39:10, 43:5, 43:19
**website** [5] - 32:15, 33:2, 33:7, 34:13, 35:9
**week** [3] - 16:25, 43:25, 46:2
**weekend** [2] - 37:11, 39:3
**weekly** [1] - 15:8
**weeks** [9] - 9:24, 10:2, 10:24, 11:16, 15:9, 15:10, 16:25, 41:20, 45:6
**Welcome** [1] - 5:10
**whatsoever** [2] - 28:17, 34:11
**willy** [1] - 35:5
**willy-nilly** [1] - 35:5
**words** [1] - 45:16
**worker** [1] - 38:9
**workers** [1] - 42:2
**works** [1] - 30:8
**World** [1] - 2:21
**world** [2] - 5:18, 32:13
**write** [1] - 45:23
**writing** [1] - 5:16

**Y**

**year** [1] - 3:3
**years** [3] - 10:13, 10:14, 44:13
**yourself** [1] - 36:13

**Z**

**zero** [1] - 35:6

## CERTIFICATE OF SERVICE

I, David S. Santee, counsel for Plaintiff, hereby certified that a true and correct copy of the foregoing Motion for a Preliminary Injunction was electronically filed with the Court on May 15, 2025, and is available for viewing and downloading from the ECF system by all counsel of record.

Dated:  May 15, 2025                      /s/ David S. Santee

David S. Santee
Pa. Bar. No. 83832
Law Offices of David S. Santee, LLC
12 Veterans Square, Suite 1
Media, PA 19063
Email: david@santeelawoffices.com
Telephone: (215) 717-8000
Facsimile: (215) 895-3995
*Attorney for Plaintiff*